Wexler *v.* Greenberg, Appellant.

Argued November 19, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and MCBRIDE, JJ.

*Earl Jay Gratz,* for appellants.

*Michael H. Egnal,* for appellees.

OPINION BY MR. JUSTICE COHEN, May 4, 1960:

Appellees, trading as Buckingham Wax Company, filed a complaint in equity to enjoin Brite Products Co., Inc., and its officers, Greenberg, Dickler and Ford, appellants, from disclosing and using certain formulas and processes pertaining to the manufacture of certain sanitation and maintenance chemicals, allegedly trade secrets. After holding lengthy hearings, the chancellor concluded that the four formulas involved are trade secrets which appellant Greenberg disclosed in contravention of his duty of nondisclosure arising from his confidential relationship with Buckingham. He decreed that appellants, jointly and severally, be enjoined permanently from disclosing the formulas or processes or any substantially similar formulas and from making or selling the resulting products. He also ordered an accounting for losses. After the dismissal by the court *en banc* of appellants' exceptions to the chancellor's findings of fact and conclusions of law, the chancellor's decree was made final and this appeal followed.

Buckingham Wax Company is engaged in the manufacture, compounding and blending of sanitation and

maintenance chemicals. In March, 1949, appellant Greenberg, a qualified chemist in the sanitation and maintenance field,[1] entered the employ of Buckingham as its chief chemist and continued there until April 28, 1957. In the performance of his duties, Greenberg consumed half of his working time in Buckingham's laboratory where he would analyze and duplicate competitors' products and then use the resulting information to develop various new formulas. He would change or modify these formulas for color, odor or viscosity in order that greater commercial use could be made of Buckingham's products. The remainder of his time was spent in ordering necessary materials and interviewing chemical salesmen concerning new, better or cheaper ingredients for the multitude of products produced by Buckingham so that costs could be lowered and quality increased. As a result of his activities Greenberg was not only familiar with Buckingham's formulas, he was also fully conversant with the costs of the products and the most efficient method of producing them.

Appellant Brite Products Co., Inc., is a Pennsylvania corporation organized on or about August 1,

---

[1] Greenberg's skill as a chemist is unquestioned. We have the chancellor's undisputed findings to the effect that Greenberg graduated from Temple University in 1939, having majored in chemistry, and received a degree of Master of Science from the University of Pennsylvania in 1940, his graduate studies being in analytical chemistry. In 1942 he studied organic chemistry at Johns Hopkins University. Since then he has been principally engaged in the maintenance and sanitation chemical industry as a chemist, having been employed by the Chemical Services Company of Baltimore, Maryland, and having operated his own businesses under the names of Janolyn and Knox Mfg. Company. The Chemical Service Company and Greenberg's own firms manufactured the same products, including liquid soap, floor finishes, and disinfectants, as are manufactured by Buckingham. In addition, of course, there is his tenure with Buckingham where Greenberg spent 50% of the eight odd years he worked for Buckingham duplicating and analyzing competitors' products.

1956, when it succeeded to the business, formerly operated by appellant Dickler, known as "Gem Shine Sales Co." From October, 1952, to August, 1956, Dickler and Brite, in unbroken succession, did most of their purchasing from Buckingham; and from August, 1956, until August 20, 1957, the date of Brite's last order, Brite exclusively purchased Buckingham's manufactured products. These products were in turn distributed by Brite to its customers, mostly industrial users, marked with labels which identified said products as products of Brite. Brite's purchases of sanitation and maintenance products from Buckingham amounted annually to approximately $35,000.

Dickler, president of Brite, met Greenberg in 1952 as a result of his business transactions with Buckingham, and had contact with Greenberg over the years in connection with the special products which were being made by Buckingham, first for Gem Shine Sales Co. and then for Brite. In June, 1957, Greenberg first approached Dickler in reference to employment; and negotiations began for Greenberg to associate himself with Brite. An agreement between them was reached whereby Greenberg became a director, the treasurer and chief chemist of Brite and, as a further consideration, received 25% of Brite's outstanding and issued capital stock. In August, 1957, Greenberg left Buckingham and went to work for Brite. At no time during Greenberg's employment with Buckingham did there exist between them a written or oral contract of employment or any restrictive agreement.

Prior to Greenberg's association with Brite, the corporation's business consisted solely of selling a complete line of maintenance and sanitation chemicals, including liquid soap cleaners, wax base cleaners, disinfectants and floor finishes. Upon Greenberg's arrival, however, the corporation purchased equipment and machinery and, under the guidance and supervision of Greenberg,

embarked on a full-scale program for the manufacture of a cleaner, floor finish and disinfectant, products previously purchased from Buckingham. The formulas in issue in this litigation are the formulas for each of these respective products.[2] The appellants dispute the chancellor's findings as to the identity of their formulas with those of Buckingham, but there was evidence that a spectrophometer examination of the respective products of the parties revealed that the formulas used in making these products are substantially identical. Appellants cannot deny that they thought the products sufficiently similar as to continue delivery of their own products to their customers in the same cans and drums and with the same labels attached which they had previously used in distributing the products manufactured by Buckingham, and to continue using the identical promotional advertising material. Appellees' formulas had been developed dur-

---

[2] The chancellor did not make any findings as to the origin of the formula for the disinfectant, nor could we discover any relevant testimony in the record on this point. The burden of establishing a trade secret is on the alleged owner. *Pittsburgh Cut Wire Co. v. Sufrin*, 350 Pa. 31, 38 A. 2d 33 (1944) ; *Macbeth-Evans Glass Co. v. Schnelbach*, 239 Pa. 76, 86 Atl. 688 (1913). The source of the alleged trade secret is necessary to show both ownership and the state of secrecy of the formula from the trade in general. The comment to the Restatement, Torts, §757, the general provision concerning trade secrets, provides: "The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. . . . Substantially, a trade secret is known only in the particular business in which it is used." 4 Restatement, Torts, §757, comment b (1939). The clear failure to meet their burden insofar as the source of the disinfectant is concerned precludes appellees from relief as to that formula. Subsequent use of the word "formula" in the text, therefore, will apply only to the other formulas in issue, the cleaner formula and the two floor finish formulas, for which the appellees have made a prima facie showing of a trade secret.

ing the tenure of Greenberg as chief chemist and are unquestionably known to him.

The chancellor found that Greenberg did not develop the formulas for Brite's products after he left Buckingham, but rather that he had appropriated them by carrying over the knowledge of them which he had acquired in Buckingham's employ. The chancellor went on to find that the formulas constituted trade secrets and that their appropriation was in violation of the duty that Greenberg owed to Buckingham by virtue of his employment and the trust reposed in him. Accordingly, the relief outlined above was ordered.

We are initially concerned with the fact that the final formulations claimed to be trade secrets were not *disclosed to* Greenberg by the appellees during his service or because of his position. Rather, the fact is that these formulas had been developed by Greenberg himself, while in the pursuit of his duties as Buckingham's chief chemist, or under Greenberg's direct supervision.[3] We are thus faced with the problem of deter-

---

[3] While no specific finding was made by the chancellor that Greenberg developed the formulas in issue, the fact is clear by necessary implication from his other findings, as well as from the testimony of Greenberg himself and the admission of counsel for the appellees in his opening remarks to the court at the trial. The chancellor found that the formula for the cleaner was created between August 23, 1951, and January 3, 1952, while the formulas for the floor finishes were the results of a series of experiments and developments which began in March, 1954, and concluded on January 10, 1957. Greenberg was the chief chemist of Buckingham throughout this time, personally performing or directing all experimentation. The conclusion is inescapable therefore that Greenberg himself was responsible for the resulting formulas. Moreover, the record discloses that Greenberg, called as on cross-examination by the appellee, identified the handwriting in the Buckingham experimentation books which described the development of the floor finishes as his own. Appellees' apparent purpose was to show Greenberg's familiarity with the formulas by virtue of the fact that he himself conducted the experiments.

mining the extent to which a former employer, *without the aid of any express covenant,* can restrict his ex-employee, a highly skilled chemist, in the uses to which this employee can put his knowledge of formulas and methods he himself developed during the course of his former employment because this employer claims these same formulas, as against the rest of the world, as his trade secrets. This problem becomes particularly significant when one recognizes that Greenberg's situation is not uncommon. In this era of electronic, chemical, missile and atomic development, many skilled technicians and expert employees are currently in the process of developing potential trade secrets. Competition for personnel of this caliber is exceptionally keen, and the interchange of employment is commonplace. One has but to reach for his daily newspaper to appreciate the current market for such skilled employees. We must therefore be particularly mindful of any effect our decision in this case might have in disrupting this pattern of employee mobility, both in view of possible restraints upon an individual in the pursuit of his livelihood and the harm to the public in general in forestalling to any extent widespread technological advances.

The principles outlining this area of the law are clear. A court of equity will protect an employer from the unlicensed disclosure or use of his trade secrets by an ex-employee provided the employee entered into an enforceable covenant so restricting his use, *Fralich v. Despar,* 165 Pa. 24, 30 Atl. 521 (1894), or was bound to secrecy by virtue of a confidential relationship existing between the employer and employee, *Pittsburgh Cut Wire Co. v. Sufrin,* 350 Pa. 31, 38 A. 2d 33 (1944). Where, however, an employer has no legally protectable trade secret, an employee's "aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course

of his employment, are not the property of his employer and the right to use and expand these powers remains his property unless curtailed through some restrictive covenant entered into with the employer:" Id. at 35. The employer thus has the burden of showing two things: (1) a legally protectable trade secret; and (2) a legal basis, either a covenant or a confidential relationship, upon which to predicate relief.

Since we are primarily concerned with the fact that Buckingham is seeking to enjoin Greenberg from using formulas he developed without the aid of an agreement, we shall assume for the purpose of this appeal that the appellees have met their burden of proving that the formulas in issue are trade secrets. The sole issue for us to decide, therefore, is whether or not a confidential relationship existed between Greenberg and Buckingham binding Greenberg to a duty of nondisclosure.

The usual situation involving misappropriation of trade secrets in violation of a confidential relationship is one in which an employer *discloses to his employee* a pre-existing trade secret (one already developed or formulated) so that the employee may duly perform his work.[4] In such a case, the trust and confidence upon which legal relief is predicated stems from the instance

---

[4] *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A. 2d 838 (1957) ; *Macbeth-Evans Glass Co. v. Schnelbach*, 239 Pa. 76, 86 Atl. 688 (1913). Cf. *Pittsburgh Cut Wire Co. v. Sufrin*, 350 Pa. 31, 38 A. 2d 33 (1944) ; *Belmont Laboratories v. Heist*, 300 Pa. 542, 151 Atl. 15 (1930) ; *Pressed Steel Car Co. v. Standard Steel Car Co.*, 210 Pa. 464, 60 Atl. 4 (1904). For authority in other jurisdictions, see *Witherow Steel Corp. v. Donner Steel Co.*, 31 F. 2d 157 (W.D. N.Y. 1929) ; *Philadelphia Extracting Co. v. Keystone Extracting Co.*, 176 Fed. 830 (E.D. Pa. 1910) ; *Junker v. Plummer*, 320 Mass. 76, 67 N.E. 2d 667 (1946) ; *Aronson v. Orlov*, 228 Mass. 1, 116 N.E. 951 (1917) ; *Cincinnati Bell Foundry v. Dodds*, 10 Ohio Dec. Reprint 154 (1887) ; *Colonial Laundries v. Henry*, 48 R.I. 332, 138 Atl. 47 (1927) ; cases collected in Annot., 165 A.L.R. 1453 ; cases cited at note 8, infra.

of the employer's *turning over to the employee* the pre-existing trade secret. It is then that a pledge of secrecy is impliedly extracted from the employee, a pledge which he carries with him even beyond the ties of his employment relationship. Since it is conceptually impossible, however, to elicit an implied pledge of secrecy from the sole act of an employee turning over to his employer a trade secret which he, the employee, has developed, as occurred in the present case, the appellees must show a different manner in which the present circumstances support the permanent cloak of confidence cast upon Greenberg by the chancellor. The only avenue open to the appellees is to show that the nature of the employment relationship itself gave rise to a duty of nondisclosure.

The burden the appellees must thus meet brings to the fore a problem of accommodating competing policies in our law: the right of a businessman to be protected against unfair competition stemming from the usurpation of his trade secrets and the right of an individual to the unhampered pursuit of the occupations and livelihoods for which he is best suited. There are cogent socio-economic arguments in favor of either position. Society as a whole greatly benefits from technological improvements. Without some means of post-employment protection to assure that valuable developments or improvements are exclusively those of the employer, the businessman could not afford to subsidize research or improve current methods. In addition, it must be recognized that modern economic growth and development has pushed the business venture beyond the size

---

Compare the formulation of the rule in the Restatement, Torts, §757: "One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if (a) he discovered the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other *in disclosing the secret to him. . . .*" (Emphasis supplied).

of the one-man firm, forcing the businessman to a much greater degree to entrust confidential business information relating to technological development to appropriate employees. While recognizing the utility in the dispersion of responsibilities in larger firms, the optimum amount of "entrusting" will not occur unless the risk of loss to the businessman through a breach of trust can be held to a minimum.

On the other hand, any form of post-employment restraint reduces the economic mobility of employees and limits their personal freedom to pursue a preferred course of livelihood. The employee's bargaining position is weakened because he is potentially shackled by the acquisition of alleged trade secrets; and thus, paradoxically, he is restrained, because of his increased expertise, from advancing further in the industry in which he is most productive. Moreover, as previously mentioned, society suffers because competition is diminished by slackening the dissemination of ideas, processes and methods.[5]

Were we to measure the sentiment of the law by the weight of both English and American decisions in order to determine whether it favors protecting a businessman from certain forms of competition or protecting an individual in his unrestricted pursuit of a livelihood, the balance would heavily favor the latter.[6] Indeed, even where the individual has to some extent assumed the risk of future restriction by express covenant, this Court will carefully scrutinize the covenant for reasonableness "in the light of the need of the employer for protection and the hardship of the restriction upon the employes." *Morgan's Home Equipment Corp. v.*

---

[5] See generally, Carpenter, Validity of Contracts Not to Compete, 76 U. Pa. L. Rev. 244 (1928) ; Blake, Employee Agreements Not to Compete, 73 Harv. L. Rev. 625 (1960).

[6] See 5 Williston, Contracts §1628 et seq., (Rev. ed. 1937), and cases cited therein.

*Martucci,* 390 Pa. 618, 631, 136 A. 2d 838 (1957). It follows that no less stringent an examination of the relationship should be necessary where the employer has *not* seen fit to protect himself by binding agreement.[7]

Coming to the case before us, in support of their position appellees cite mostly decisions involving the disclosure of pre-existing secrets to establish that a binding confidential relationship existed between Greenberg and Buckingham.[8] As we have previously noted, the pre-existence itself gives rise to the implied pledge of confidence; these cases are thus inapposite here. In *Extrin Foods, Inc. v. Leighton,* 115 N.Y.S. 2d 429 (1952), also cited by appellees, the New York court found sufficient circumstances to give rise to an implied agreement not to reveal the trade secrets that the defendant developed during his employment. The employee therein, a chemist, was assigned a specific task for which he was given valuable leading information, including pre-existing trade secrets, careful supervision and license to enter into research and experimentation so as to attain the theretofore unobtainable goal which *Extrin* had been seeking.[9] A similar situation may be found in *Wireless Specialty Apparatus Co. v. Mica Condenser*

---

[7] See Ellis, Trade Secrets, §246 (1953).

[8] *Sun Dial Corporation v. Rideout,* 29 N.J. Super. 361, 102 A. 2d 90 (1954) ; *Franke v. Wiltschek,* 209 F. 2d 493 (2nd Cir. 1953) ; *Smith v. Dravo Corp.,* 203 F. 2d 369 (7th Cir. 1953) ; *Belmont Laboratories v. Heist,* 300 Pa. 542, 151 Atl. 15 (1930) ; *Macbeth-Evans Glass Co. v. Schnelbach,* 239 Pa. 76, 86 Atl. 688 (1913) ; *Pressed Steel Car Company v. Standard Steel Car Company,* 210 Pa. 464, 60 Atl. 4 (1904).

[9] Said the court: "Even though the contract of hiring contained no express covenant, the individual defendants by an *implied agreement* bound themselves not to disclose, reveal or appropriate secret processes or formulae. . . . *Liability under these circumstances is predicated on the breach of this duty rather than on a specific property right of plaintiff.* Sec. 757 Restatement of the Law of

*Co., Ltd.,* 239 Mass. 158, 131 N.E. 307 (1921), where defendant engineers were enjoined from disclosing trade secrets they had developed while employed by the Wireless company. There, the company, in order to remain in business after the close of the war, had assigned its six engineers, including the defendants, to the specific research project of developing a method of manufacturing magneto condensers (the trade secret in issue) and had committed them to six months of extensive research and experimentation solely towards this end under the general supervision of its chief engineer.[10]

---

Torts, p. 4." (Emphasis supplied). *Extrin Foods, Inc. v. Leighton,* 115 N.Y.S. 2d 429, 434 (1952).

Considering this quoted portion of the opinion, it is clear that the New York Court did not predicate liability on any peculiar property right derived from ownership of a trade secret, but instead found that the relationships between *Extrin* and the individual defendant gave rise to this implied agreement of secrecy.

[10] Said the court: "In a case like this the nature of the employment impresses on the employee such a relationship of trust and confidence as estops him from claiming as his own property that which he has brought into being solely for the benefit, and at the express procurement, of his employer. The want of an express agreement that the ownership shall be in the employer is not fatal under such circumstances." *Wireless Specialty Apparatus Co. v. Mica Condenser Co., Ltd.,* 239 Mass. 158, 131 N.E. 307, 309 (1921). Then having found *Wireless* to be the "owner" of the trade secrets, the court went on to enjoin the defendants, saying: "Goodwin, upon leaving the plaintiff's employ, had a right to use his general knowledge, experience, memory and skill so long as he did not use or disclose any of the secret processes which the plaintiff *was entitled to keep for its own use* and as to which it, as against him, *had exclusive property rights."* (Emphasis supplied). Id., at 309. The Massachusetts Court thus found that the relationship between the individual defendants and the *Wireless Company,* that of being inventors "wholly engaged in 'experimental work . . .'" that "for the time being was their sole employment . . . under the direction of the plaintiff's superintendent who aided and furnished information to them," was sufficient not only to vest ownership rights in the *Wireless Company,* but also to allow them to enjoin secrecy.

As decisions of sister jurisdictions, these two cases, of course, are not binding upon this Court. Nevertheless, they are good examples of the kind of employment relationships in which a court will find that a confidential relationship exists. Upon our examination of the record here, however, we find that the instant circumstances fall far short of such a relationship. The chancellor's finding that Greenberg, while in the employ of Buckingham, never engaged in research nor conducted any experiments nor created or invented any formula was undisputed. There is nothing in the record to indicate that the formulas in issue were specific projects of great concern and concentration by Buckingham; instead it appears they were merely the result of Greenberg's routine work of changing and modifying formulas derived from competitors. Since there was no experimentation or research, the developments by change and modification were fruits of Greenberg's own skill as a chemist without any appreciable assistance by way of information or great expense or supervision by Buckingham, outside of the normal expenses of his job. Nor can we find anything that would indicate to Greenberg that these particular results were the goal which Buckingham expected him to find for its exclusive use. The chancellor's finding that Greenberg knew at all times that it would be prejudicial and harmful to Buckingham for the formulas to be disclosed merely shows that Greenberg knew the value of his finds and the harmful effects that competition by similar products could bring. His knowledge by itself, however, cannot support a finding that he was never to compete.

Accordingly, we hold that appellant Greenberg has violated no trust or confidential relationship in disclosing or using formulas which he developed or were developed subject to his supervision. Rather, we hold that this information forms part of the technical knowl-

edge and skill he has acquired by virtue of his employment with Buckingham and which he has an unqualified privilege to use.

Having found Greenberg was privileged to disclose and use the formulas in issue, the case against the other appellants must also fall. With regard to appellants Brite, Dickler and Ford, the formulas here may be said to be trade secrets. Ownership of a trade secret, however, does not give the owner a monopoly in its use, but merely a proprietary right which equity protects against usurpation by unfair means.[11] Former customers are legally entitled to compete with their suppliers, even if they use identical goods, as long as they do so properly. From the legal standpoint these appellants have done nothing improper. Greenberg approached Dickler here with a proposition; Dickler did not entice him away. Even so, what appellants wanted and needed was a qualified chemist in the maintenance and sanitation field; and who was better than the chemist of their supplier if they could properly get him. They sought not Buckingham's trade secrets, but Greenberg's expertise. Since we have found that Greenberg divulged only information which he had a privilege to divulge, no legal wrong has been committed. To hold that Greenberg had a privilege to divulge this information but that the other appellants committed a wrong in receiving it would be to render the privilege illusory.

Decree reversed, at appellees' costs.

Mr. Justice BELL dissents.

---

[11] See I Nims, Unfair Competition and Trade-Marks §141 et seq. (4th ed. 1947) ; 2 Callman, Unfair Competition and Trade-Marks §51 et. seq. (2nd ed. 1950) ; Ellis, Trade Secrets §1 (1953). See also, comment a, Restatement, Torts, §757.