## F. G. Okie, Incorporated v. Attaway

174

*Charles A. Kerlavage*, for plaintiff.
*William L. O'Hey, Jr.*, for defendants.

FORREST, P. J., December 11, 1962.—Plaintiff filed its complaint for an injunction (1) restraining defendants from manufacturing, compounding, distributing or selling "Opalux", a material allegedly having the same physical and chemical characteristics as "Velo", manufactured by plaintiff, for the coating of pills or tablets; (2) restraining defendants from representing that defendants possess or have the right to possess plaintiffs' allegedly secret process of manufacturing "Velo"; (3) directing defendants to withdraw their application for a patent for "Opalux" and to refrain from reapplying for such a patent; (4) directing defendants to account for profits heretofore made from the sale of "Opalux", or any similar coating compound; and (5) restraining defendants from using trade sec-

rets or confidential information allegedly obtained by defendants from plaintiff.

Defendants filed responsive answers raising the following issues:

(1) (a) Whether plaintiffs' product, "Velo", is a better and more efficient form of coating than that manufactured under patented formula owned by Smith, Kline and French Laboratories; (b) whether "Velo" is manufactured by a secret process, and (c) whether the process of manufacturing Velo was confidentially related to the individual defendants by plaintiff's president.

(2) Whether defendants, John A. Attaway and James Ryder Murphy, obtained knowledge of any secret process of manufacturing "Velo" during their employment by plaintiff.

(3) Whether defendant, James Ryder Murphy, entered into a written agreement with plaintiff acknowledging that he was acquiring information from plaintiff in confidence and promising not to divulge such information.

(4) Whether the individual defendants are chemists or pharmacists or have any knowledge of chemistry.

(5) Whether the formula and concentration of "Opalux", now manufactured by defendant, Colorcon, Inc., is practically identical with "Velo".

## Findings of Fact

1. Plaintiff, F. G. Okie, Inc., manufactures and sells "Velo", a coating compound for pharmaceutical tablets. For approximately three and one-half years immediately preceding April 2, 1962, plaintiff had its principal office and place of business in Ambler, Pa. Since April 2, 1962, plaintiff has had its principal office and place of business at Fort Washington Indus-

trial Park, Fort Washington, Pa. Plaintiff's president is John R. Kane.

2. On April 1, 1961, plaintiff employed defendant, John A. Attaway, hereinafter called Attaway, as sales manager. This contract was oral, without any restrictive conditions.

3. On June 19, 1961, plaintiff employed defendant, James Ryder Murphy, hereinafter called Murphy, as sales manager of a pharmaceutical division. This contract was oral. In the course of his work, defendant travelled and solicited prospects and customers in the States of Pennsylvania, New Jersey, New York and other States south, to and including Virginia. At the same time, defendant entered into a written restrictive agreement with plaintiff, providing inter alia:

"1. I (James Ryder Murphy) hereby agree that any technical or manufacturing information concerning the Company's products and any lists of customers or records of customer requirements and usages, and other confidential information or data, prepared by me or which come into my possession during my employment by the Company are, and remain the property of, the Company, and that, if and when my employment by the Company is terminated, said technical and manufacturing information and said customer lists, records of customer requirements and usages, . . . shall be left with the Company as a part of its property, confidential information and/or records. I further agree that I will not give copies thereof, or otherwise divulge the said information or the content of the items above listed, or other information which is confidential or detrimental to the Company, to any person not employed by the Company, either during the course of my employment or thereafter, without first obtaining written permission from the Company so to do.

"2. I further agree, subject to the conditions hereinafter stated, that within three years after leaving the employ of the Company I shall not engage in or enter the employ of, nor directly or indirectly represent, nor act as a sales agent or broker for the products of, nor act as an advisor or consultant for any person, persons, partnership, firm, or corporation which is engaged in, or is about to become engaged in, business in competition with the Company with respect to products, whether or not referred to in the initial paragraph of this Agreement, which at any time during the course of my employment by the Company I have sold or distributed for the Company, or in respect of which I have had sales responsibility or have acquired technical or manufacturing information or information as to customer lists or requirements, or other confidential information, as a result of my said employment. Since I understand that the Company's business is not now limited to the United States and that the Company intends to expand its business, wherever possible, throughout the world, I have intentionally not limited this paragraph to any specific area, because it is my understanding that it will apply to competitor companies wherever they may exist.

"3. A condition of paragraph 2 of this Agreement is that if after being in the employ of the Company for six (6) months or more, I am then discharged by the Company from its employ and am unable (within three months after the end of the calendar month of said discharge) to secure any suitable new employment or gainful occupation consistent with paragraph 2 of this Agreement, after having devoted my best efforts during said three month period to finding such employment, then, upon written notice by me thereof, by registered mail, to the Company at its office in Ambler, Pennsylvania, the Company, unless it notifies me in writing that it elects not to enforce the terms of para-

graph 2 of this Agreement, agrees to forward to me at the end of each month thereafter, for so long a time as it elects to enforce paragraph 2 of this Agreement or until such time as I am able to find employment consistent with the terms of this Agreement, a check in the amount equal to one-half the monthly salary (exclusive of extra compensation of any kind) I was receiving at the date of my discharge. I agree that during any period that I may receive such a check from the Company I will continue conscientiously to seek new employment or occupation consistent with this agreement. If and when the Company notifies me of its intentions not to continue to enforce the conditions of paragraph 2 of this Agreement, or after the expiration of one year from the end of the calendar month of my said discharge, whichever occurs sooner, I shall not be precluded from accepting employment which I would otherwise, as a matter of law and fair dealings, be free to accept.

"4. The conditions set forth in paragraph 3 hereof apply only in the event I am discharged by the Company from its employ; otherwise the provisions of paragraph 2 hereof apply without any condition or exception. The provisions of paragraph 1 hereof apply during my employment and at all times thereafter, irrespective of the manner in which said employment is terminated."

4. Smith, Kline and French has a patent No. 2,925,-365 for a formula for the coloring of pharmaceutical tablets.

5. Smith, Kline and French on March 21, 1961, informally licensed plaintiff and on July 27, 1961, formally licensed plaintiff to manufacture in accordance with the patented formula.

6. Plaintiff made certain changes in the formula, specifically (1) elimination of the surfactant (surface-active agent) ; (2) removal of the water or moist-

ure shown in the patent; and (3) utilization of greater concentration of pure food color than shown in the patent.

7. Even prior to 1958, Wyeth Laboratories, Bryant Laboratories, Yates Drug Co., Volar and Nysco Laboratories used a coating composition including organic pigment without surfactant. Anthony Dippolito, a tablet coater, used tablet coating compositions of lakes, titanium dioxide and sugar syrup, without a surfactant, since 1955, and Tsugio Hamada, of Vitamix Corporation, did likewise, beginning in 1959.

8. At or about January or February, 1961, before plaintiff employed Attaway, John R. Kane, plaintiff's president, disclosed the process of making Velo to Attaway.

9. Mr. Kane likewise, disclosed the process of making Velo to Mr. Murphy.

10. One reason why Mr. Kane discussed and disclosed to Messrs. Attaway and Murphy the process of manufacturing Velo was so that Attaway and Murphy might have the information for discussion with the trade.

11. At no time did Mr. Kane tell Attaway or Murphy that Velo was a trade secret and not to be discussed with the trade.

12. No restrictions were placed upon the movements of Attaway and Murphy in and about plaintiff's plant. These defendants were allowed to observe the manufacturing of Velo, and they were granted access to plaintiff's files.

13. In the course of their duties, defendants Attaway and Murphy, told customers and prospective customers of plaintiff what the product "Velo" was made of.

14. While Attaway and Murphy were employed by plaintiff, plaintiff's price list for "Velo" was distrib-

uted to the trade and stated the color ingredients of "Velo".

15. Certain customers of plaintiff were dissatisfied with the "Velo" which they purchased from plaintiff.

16. Attaway drew no salary from plaintiff and had to resort to personal savings to meet his living expenses during the period of his employment by plaintiff.

17. At the time plaintiff employed him, Attaway invested $1,600 in plaintiff.

18. Attaway was elected Vice President of plaintiff on May 22, 1961, and director on May 23, 1961.

19. In September, 1961, plaintiff entered into a ten-year lease for a new building in Fort Washington, Pa., at a monthly rental of $1,470 for the purpose of expanding plaintiff's "Velo" program.

20. Attaway and Murphy were discharged from their employment by plaintiff on October 10, 1961, for the stated reasons that sales expenses and overhead were too high, although sales and customers had shown satisfactory increase.

21. At the time Attaway was discharged, he asked plaintiff for an accounting of credits due to him for unpaid salary. Plaintiff in lieu of cash paid Attaway 14 shares of its stock, valued at that time, October 16, 1961, at $500 per share.

22. Defendant, Colorcon, Inc., was incorporated on November 8, 1961. Attaway is president and Murphy is plant manager of this corporation, which manufactures and sells a coating compound known as "Opalux" for pharmaceutical tablets. Although Murphy was a salesman for plaintiff and previously for another company, his present duties involve no selling.

23. Colorcon, Inc., in order to develop "Opalux":

(a) retained Dr. William H. Holst as a professional consultant;

(b) obtained technical assistance from Aaron Cohen, Vice President and technical director of Thomasset Colors Division of Sterling Drug Company, an expert in chemistry and color;

(c) obtained technical assistance from the head chemist of Warner Jenkinson Manufacturing Company;

(d) obtained technical assistance from Tsugio Hamada, Vice President of Vitamix Corporation and production manager of Lusgarten Laboratories. Colorcon, Inc., subsequently retained Mr. Hamada as a professional consultant; and

(e) obtained technical assistance from suppliers in the trade.

24. Defendants did not use plaintiff's customer lists, but prepared mailing lists and prospect lists from

(a) Boyd's City Dispatch;

(b) Manhattan Telephone Directory;

(c) American and Canadian mailing lists; and

(d) Drug Trade News mailing lists.

25. Murphy received a B. S. degree from the University of Maryland, where he studied chemistry, soil chemistry, art and manufacture of pigments. He is trained in the use and mixing of color pigments.

26. Attaway holds a B. S. degree from Lehigh University where he studied chemistry for one year. He was a salesman for Minnesota Mining and Manufacturing Company for 12 years during which time he dealt in colors and chemistry.

27. John R. Kane has had no formal education in the field of chemistry or pharmaceutical chemistry. However, he has acquired considerable competence in chemistry by his own informal study and experience.

## Discussion

The evidence indicates that "Velo" is an improvement upon the coating obtainable by the use of the unmodified Smith, Kline and French patented formula.

Is "Velo" a trade secret subject to misappropriation? "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, . . . or a list of customers. . . . A trade secret is a process or device for continuous use in the operation of the business. . . .

"Secrecy. The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret . . . a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of efforts or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others": Restatement, Torts, §757, Comment b.

The burden is upon plaintiff to show that it has a trade secret or a secret process of manufacture: Pittsburgh Cut Wire Company v. Sufrin, 350 Pa. 31 (1944); Wexler v. Greenberg, 399 Pa. 569, 574, fn. 2 (1960). "Velo" is composed of a lake (color pigment), titanium dioxide (an opacifier) and sugar

syrup, and does not include a surfactant. There is nothing new or secret about such coating compositions. John O. Barnett, of Wyeth Laboratories, used such a composition by August, 1958. In the December 1958 issue of American Pharmaceutical Association Scientific Edition, an article described a coating composition such as "Velo", but included a surfactant. However, even before that time certain companies applied coatings without surfactants. One of these companies was Nysco Laboratories, whose customers, Squibb, Phisor and Geiger, knew that Nysco's coating composition included lakes, titanium dioxide and sugar syrup without a surfactant. This coating composition was known to Nysco's coaters, some of whom moved to other jobs, where they used their knowledge of Nysco coating.

Plaintiff makes "Velo" under a license from Smith, Kline and French, who own patent No. 2,925,365. Plaintiff does not use a surfactant, but any one skilled in this field could easily duplicate the coating composition of patent No. 2,925,365 and would know that the surfactant is unnecessary.

Even if the composition of "Velo" were not well-known in the trade, plaintiff would have no trade secret since it took no meaures to keep the composition a secret. Plaintiff's president disclosed the process of manufacturing "Velo" to Mr. Attaway before plaintiff employed Attaway. Such president also explained the changes in the formula of patent No. 2,925,365 to produce "Velo" to Mr. Murphy as soon as plaintiff employed him. Plaintiff's president never told the individual defendants that the composition of "Velo" was a trade secret.

These defendants were expected to, and did, disclose to customers and prospects what "Velo" was made of, and the plaintiff's price list disclosed the color pigments (lakes) of its products. For these reasons, the

chancellor concludes that "Velo" was not manufactured by a secret process, nor did the individual defendants acquire the information as to the manufacturing process by improper means.

Did defendant, Attaway, enter into a written agreement with plaintiff such as Murphy did? Mr. Kane, plaintiff's president, testified that Mr. Attaway signed such an agreement and insinuated, at least, that someone filched the agreement from the corporation's files. Mr. Kane said that his secretary, Mrs. Bennett, saw the agreement. However, Mrs. Bennett did not testify. Further, the attorney, who prepared the agreement for Mr. Murphy to sign, testified that he prepared no such agreement for Mr. Attaway's signature. Mr. Attaway denied signing such an agreement. All in all, the strong preponderance of evidence is that Attaway did not sign such an agreement.

Is Attaway, irrespective of the absence of a restrictive covenant, bound to secrecy as to customer lists and other confidential information of plaintiff? "A court of equity will protect an employer from the unlicensed disclosure or use of his trade secrets by an ex-employee provided the employee . . . was bound to secrecy by virtue of a confidential relationship existing between the employer and employee . . .": Wexler v. Greenberg, supra, 576.

"The usual situation involving misappropriation of trade secrets in violation of a confidential relationship is one in which an employer discloses to his employee a pre-existing trade secret (one already developed or formulated) so that the employee may duly perform his work. In such a case, the trust and confidence upon which legal relief is predicated stems from the instance of the employer's turning over to the employee the pre-existing trade secret. It is then that a pledge of secrecy is impliedly extracted from the employee, a pledge which he carries with him even beyond the ties of his

employment relationship . . .": Wexler v. Greenberg, supra, pp. 577, 578.

Considering the conduct of Attaway, Murphy and Colorcon, Inc. separately or as in concert, the Chancellor is of the opinion that defendants did not commit a tortious breach of confidential relation regarding manufacturing or sales. As has been stated hereinabove, the process of manufacture of "Velo", or its equivalent, is not a secret. Furthermore, Colorcon, Inc., at its expense, developed its own product from professional information, research and advice of professional consultants, chemical companies and suppliers in the trade. Concerning *sales*, the evidence discloses that defendants readily developed their own mailing lists and prospect lists from outside sources. Thus, the doctrine that confidential customer data is entitled to protection as a trade secret is inapplicable in this case: Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 624, fn. 2 (1957).

The restrictive covenant signed by Murphy remains to be considered. Judicial treatment of covenants not to compete has shifted across the centuries. At first, all such covenants were held void as against public policy. However, by the eighteenth century, England found itself in the midst of a new commercial era, and adjusting to changed economic conditions, the courts upheld at common law contracts in partial restraint of trade, provided they were ancillary to a principal transaction and were reasonably limited both in geographical extent and duration of time.

"This rule has come down to us as part of the present-day law of Pennsylvania. We have held that employment contracts containing general covenants by an employee not to compete after the termination of his employment are prime facie enforceable if they are reasonably limited as to duration of time and geographical extent. Seligman & Latz v. Vernillo, 382 Pa.

161, 114 A. 2d 672 (1955): Plunkett Chemical Co. v. Reeve, 373 Pa. 518, 95 A. 2d 925 (1953). General covenants are reasonably limited if they are 'within such territory and during such time as may be reasonably necessary for the protection of the employer . . . without imposing undue hardship on the employee . . .' Restatement Contracts, §516 (f) (1932)": Morgan's Home Equipment Corp. v. Martucci, supra, p. 628. Accord: Pennsylvania Funds Corporation v. Vogel, 399 Pa. 1, 8 (1960).

A general covenant not to compete imposes a greater hardship upon an employe than upon a seller of a business. In view of this greater hardship imposed upon an employe, general covenants not to compete, which are ancillary to employment, will be subjected to a more stringent test of reasonableness than that which is applied to such restrictive covenants ancillary to the sale of a business. See Restatement of Contracts, §515(b), Comment b (1932); Annotations, 43 A.L.R. 2d 94, 111 (1955), 41 A. L. R. 2d 15, 30 (1955).

The "Restatement, Contracts, §515 states five particulars in which a restraint of trade is generally unreasonable. It is unreasonable 'if it (a) is greater than is required for the protection of the person for whose benefit the restraint is imposed, or (b) imposes undue hardship upon the person restricted, or (c) tends to create, or has for its purpose to create, a monopoly, or to control prices or to limit production artifically, or (d) unreasonably restricts the alienation or use of anything that is a subject of property, or (e) is based on a promise to refrain from competition and is not ancillary either to a contract for the transfer of goodwill or other subject of property or to an existing employment or contract of employment.' . . .": Harris Calorific Company v. Marra. 345 Pa. 464, 469 (1942).

A restriction without express limitation of space (but with a limitation as read into the agreement by

the court) "does not necessarily involve the invalidity of a promise, and unless the restriction [as interpreted] be greater than is needed for the protection of the promise, the promise is valid": Plunkett Chemical Company v. Reeve, 373 Pa. 513, 516 (1953). However, "if the restraint be general, that is, not limited to a reasonable time and district, it is void at law, and of course will not be enforced in equity": Keeler v. Taylor, 53 Pa. 467, 469 (1866). See also Philadelphia Dairy Products Co., Inc. v. Kleiman, 36 D. & C. 643 (1939), and Mohler Baking Co. v. Kwiatkowski, 22 Erie 83 (1940).

The author of 43 A. L. R. 2d, supra, states at page 144:

"The first and primary requirement in determining the reasonableness of a territorial restraint is that the restraint must be necessary in its full extent for the protection of the employer's business or good will. If this requirement is not met, the territorial scope of the restraint is unreasonable, and no further inquiry into the presence or absence of the remaining two requirements is necessary . . .

"Thus, it may be stated now that the test applied in determining the permissible territorial operation of a covenant not to compete is whether the territorial scope, as contained in the restrictive covenant, is, in its full extent, necessary for the protection of the legitimate interest of the employer, and, if so, whether it imposes on the employee an unduly harsh and oppressive restraint, . . .

"Practically all these statements [in leading cases] contain an express reference to the requirement that the restraint as to territory, in order to be reasonable, must be necessary in its entirety for the protection of the employer's legitimate rights, the above requirement being couched in either affirmative or negative language."

Again at page 151:

"First element: reasonableness as to employer. A. In general . . . the general rule is that the restraint as to territory, in order to be reasonable, must be necessary in its full extent for the protection of some legitimate interest of the employer. Stated negatively, the territorial scope renders the restraint unreasonable, if it covers an area broader than necessary to protect the legitimate interests of the employer": (Citing Srolowitz v. Roseman, 263 Pa. 588; Plunkett Chemical Co. v. Reeve, 373 Pa. 513; Erie County Mills Asso. v. Ripley, 18 Pa. Superior Ct. 28; Philadelphia Towel, etc. Co. v. Weinstein, 57 Pa. Superior Ct. 290; Clark & Clark v. Pinkerton, 111 Pa. Superior Ct. 150; Standard Dairies v. McMonagle, 139 Pa. Superior Ct. 267; Shoemaker Ice Co. v. Rutherford, 20 Montg. 159, and numerous other cases.)

"Where the agreement contains no limitation on the area or territory covered, . . . the courts will sustain the contract if in view of attendant circumstances they can interpret it as providing for a reasonable limitation": Seligman & Latz of Pittsburgh, Inc. v. Vernillo, 382 Pa. 161, 165 (1955). "An agreement in restraint of trade which is limited in either space or time is prima facie good": Ross v. Houck, 184 Pa. Superior Ct. 448, 450 (1957). The burden rests upon him who alleges otherwise: Morgan's Home Equipment Corp. v. Martucci, supra, at page 628.

As an illustration of a restraint of trade which is unreasonable as imposing undue hardship upon the person restricted, the Restatement of Contracts, §515 (b), Illustration 7, states:

"A and B enter into a contract of employment in which B promises not to engage in a similar business anywhere within the State after the termination of the employment. A's business does not extend throughout

the State but he hopes that it may later do so. B's promise to refrain from entering into a similar occupation is illegal."

In this case the covenant contains an acknowledgement by Murphy that "the Company's business is not now limited to the United States and that the Company intends to expand its business wherever possible, throughout the world."

However, the chancellor has not found that plaintiff does an international, or even an interstate business. The covenant being unlimited in its geographical application to defendant is, therefore, unreasonable and hence unenforceable.

". . . The party seeking to enforce such a contract was required to come within the rule requiring conscionable conduct on his own part": American Ice Company v. Hunter, 60 Pa. Superior Ct. 311, 314 (1915). Plaintiff does not suggest that Attaway and Murphy were faithless or unproductive employes. Its sole ground for dismissal evidently was to reduce operating expenses.

*Conclusion of Law*

1. The court has jurisdiction over the parties, over the subject matter and over this cause of action.

2. Regarding its materials, process of manufacture, and customer lists, plaintiff has failed to establish that it has any trade secrets.

3. The restriction in the covenant signed by defendant, Murphy, is an unreasonable restraint of trade, being greater than is required for the protection of plaintiff.

4. Complaint should be dismissed.

5. Plaintiff should pay one-half of the prothonotary's and sheriff's costs and defendant, Murphy, should pay the other half. All parties shall pay their own costs.

*Decree Nisi*

And now, December 11, 1962, the complaint is dismissed.

Prothonotary's and sheriff's costs to be divided as follows: One-half to be paid by plaintiff and one-half to be paid by defendant, James Ryder Murphy. All parties to pay their own costs.

The prothonotary shall give prompt notice hereof to the parties.

Exceptions may be filed within 20 days after such notice. If no exceptions are filed, this decree nisi shall be entered by the prothonotary, upon praecipe, as the final decree.