## General Battery Corp. v. Slaton

*Byron Yatron, Anthony S. Volpe,* C. Frederick *Koenig III,* for plaintiff.

*Lee E. High, Zachary T. Wobensmith, III, Donald R. Piper, Jr.,* for defendant.

SAYLOR, *J.,* December 12, 1984—

## FINDINGS, CONCLUSIONS AND ORDER MODIFYING PRELIMINARY INJUNCTION

### BACKGROUND

This case involves trade secrets and injunctive relief. On March 16, 1984, we entered a temporary or special injunction with bond in the amount of $500,000. Since then we have had extensive preliminary hearings on the continuation of the injunction under Pa.R.C.P. 1531. We now make the following findings, conclusions and modification order.

### FINDINGS OF FACT

1. Plaintiff is General Battery Corporation (GBC), a Delaware corporation, having a place of business in Reading, Berks County, Pa.

2. GBC is engaged in the manufacture and sale of lead acid batteries for automotive, commercial and industrial markets.

3. Defendant is Earl J. Slaton (Slaton), an adult individual residing at R.D. 5, Sinking Spring, Berks County, Pa.

4. On April 2, 1982, GBC offered Slaton a job to work in the quality control department as its Quality Systems Engineer at a starting salary of $2,917 a month (Exhibit "A" to complaint).

5. Slaton was to report to Michael Reed, Corporate Director of Quality Assurance and Control.

6. Slaton accepted the job on April 12, 1982.

7. As an incident to his employment, Slaton signed a Confidential Disclosure Agreement (Exhibit 2) and an Invention Agreement (Exhibit 3).

8. These are GBC's standard agreements which it requires all salaried employees to sign as an incident to employment.

9. The Confidential Disclosure Agreement provides, in part, that (unless GBC's written consent is first secured) Slaton will not disclose at any time during or after his employment any ideas, inventions, know-how, trade secrets, technical information, processes, machinery and customer information disclosed to him by GBC during the course of his employment, whether or not developed by him.

10. The Confidential Disclosure Agreement further provides that, upon termination of his employment, Slaton will promptly deliver to GBC, and not keep or deliver to anyone else, all documents, drawings, blueprints and all other material of a secret or confidential nature.

11. In the manufacture of batteries it is recognized in the lead acid battery industry that substan-

tial production savings and product quality can be realized if paste weight and grid weight can be controlled.

12. Computerized paste-weight control systems have been available in the market place to the lead acid battery industry for some time.

13. GBC found such control systems to be expensive and unsuitable. These systems, described as "Non-contact measurement systems," use radioisotopes to monitor the product by backscatter techniques. They require factory calibration; assume that the weight of uncoated grids are constant and accurately known; and require continuous measurement on-line.

14. In the market place computerized gridweight control systems have been proposed, but none have been implemented.

15. One of Slaton's initial assignments was to work on the development of a computerized management information system which would store various GBC business activities; such as, warranty information, quality costs, warranty costs, process control perimeters, pricing information and personnel records. Necessary to this assignment Slaton was given access to GBC's confidential management information system (MIS).

16. GBC, early in 1982, started a research project to develop an inexpensive system to accurately measure and control paste weight.

17. This was a joint quality-control and manufacturing department project.

18. Finding a solution to this common industrial problem would give GBC a substantial competitive edge in the market place.

19. While working on the development of a computerized management information system, Slaton

became aware of GBC's paste-weight control project.

20. Before coming to GBC, Slaton was employed by P. R. Mallory Company (Duracell).

21. Although it manufactures and sells batteries, Duracell is not a competitor of GBC—it is not in the lead acid battery industry; it is in the primary and alkaline battery market.

22. While at Duracell, Slaton designed several computerized quality-control systems.

23. Having previously designed computerized quality-control systems at Duracell and having become aware of GBC's paste-weight control project, Slaton made known to GBC's manufacturing and engineering department that he might aid in developing a system.

24. Thereafter, Slaton played a key and central role in developing an off-line, non-continuous, real time computerized system for determining the weight of pasted grids so that the amount of paste applied to the grids could be varied to meet certain specifications (paste-weight control system).

25. The paste-weight control system utilizes scales connected to a computer. The computer directs the on-line pasting machine operator to take measurements or to make adjustments. The computer takes into account variation in grid weight and paste moisture and computes optimum setting to achieve consistent lead usage.

26. The paste-weight control system components are storebought or off-the-shelf items, namely, a Commodore computer connected by a modem to an Apple computer, but the method of interconnecting these systems is not generally known in the industry.

27. Development and use of the paste-weight control system led GBC to consider its application to a grid casting-weight control system (sometimes in the record referred to as "plate-weight control system").

28. Slaton actively participated in the development of a proposed grid-weight control system.

29. The grid-weight control system was only approved by GBC after Slaton terminated his employment.

30. GBC has yet to install and use the proposed and approved computerized grid-weight control systems at any of its plants.

31. GBC has installed and uses four computerized paste-weight control systems in two plants.

32. These systems are located in lead hazard areas of the plants. Access is limited to personnel who are trained in handling lead and required to wear protective equipment, including respirators. People would not normally visit these areas of the plants.

33. The cost to purchase and install one computerized paste-weight control system of the type available in the market place exceeds $100,000. Excluding start-up costs, GBC's system installed costs $15,000 to $20,000.

34. According to a report Slaton submitted, in addition to other benefits, a combined program of computer-based grid and paste controls at GBC would conservatively result in savings of $351,261 per year in grid lead and $314,058 in lead oxide — a significant savings, in the opinion of Michael Reed, which would give a lead acid battery manufacturer a competitive advantage.

35. On May 13, 1983, Slaton resigned from his job at GBC. He gave 30 days notice but was terminated by GBC on May 13, 1983 (Exhibit 55 is

Slaton's exit interview; Exhibit 56 is GBC's official discharge).

36. Some time before leaving GBC, Slaton told Michael Reed he was thinking about leaving and going into a venture using his systems expertise and offering to the industry paste and grid weight computer-based systems. Reed cautioned against it, reminding Slaton of the agreements he had signed.

37. After terminating his employment with GBC, Slaton helped to form and became associated with a new corporation known as CBE Corp. (CBE).

38. CBE offers for sale to GBC competitors computerized paste-weight and grid-casting control systems similar to those Slaton played a key role in devising and developing at GBC.

39. Slaton caused two GBC engineering drawings to be identically duplicated and incorporated in CBE's ad literature and technical materials.

40. Slaton is no longer employed by CBE; he is currently employed elsewhere.

41. One can reasonably expect that Slaton will attempt to profit by using and disclosing the computerized weight-control systems he helped to develop at GBC.

## THE LAW

1. In order to obtain preliminary injunctive relief, GBC must establish each of the following criteria:

(a) Such relief is necessary to prevent immediate and irreparable harm which cannot be compensated for by damages;

(b) it will operate to restore the parties to the status quo as it existed immediately before the alleged wrongful conduct; and

(c) greater injury will result from denial of the preliminary injunction than from granting it.

In addition, the court must be satisfied that plaintiff's right is clear and the wrong manifest. Keystone Guild, Inc. v. Pappas, 399 Pa. 46, 159 A.2d 681 (1960); and Valley Center, Inc. v. Parkhouse, 62 Pa. Commw. 453, 437 A.2d 74 (1981).

2. A person may be enjoined from disclosing or using another's trade secrets. Air Products and Chemicals, Inc. v. Johnson, 296 Pa. Super. 405, 442 A.2d 1114 (1982), Restatement of Torts §757 (1936).

3. Trade secrets may cover a wide spectrum of categories. A definition of the possible objects of trade secrecy is subject to variations and changes depending upon the facts in each case. Pennsylvania has adopted the definition of trade secret set forth in Comment (b) to section 757 of the Restatement of Torts which reads:

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. . . ."

An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are:

(1) The extent to which the information is known outside of his business;

(2) The extent to which it is known by employees and others involved in his business;

(3) The extent of measures taken by him to guard the secrecy of the information;

(4) The value of the information to him and to his competitors;

(5) The amount of effort or money expended by him in developing the information;

(6) The ease or difficulty with which the information could be properly acquired or duplicated by

others. Van Products Company v. General Welding and Fabricating Company, 419 Pa. 248, 213 A.2d 769 (1965).

4. Novelty .or uniqueness are not prerequisites for a product or concept to qualify as a trade secret. Computer Printing Systems, Inc. v. Lewis, 281 Pa. Super. 240, 422 A.2d 148, 153 n.3 (1980). A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectible secret. Anaconda Company v. Metric Tool & Die Company, 485 F. Supp. 410 (E.D., Pa. 1980).

5. To succeed in an action alleging misappropriation of a trade secret the burden is on plaintiff to show:

(1) That there was a trade secret;

(2) That it was of value to the employer and important in the conduct of his business;

(3) That by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret; and .

(4) That the secret ·was communicated to the employee while he was employed in a position of trust and confidence under such circumstances as . to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer. McBeth-Evans Glass Co. .v. Schnelbach, 239 Pa. 76, 87 Atl. 688 (1913).

6. Ownership of a trade secret does not give the owner a monopoly in its use, but merely a proprietary right which equity protects against usurpation by unfair means. Wexler v. Greenberg, 399 Pa. 569, 160 A.2d 430 (1960).

7. Equity will protect an employer from the disclosure or use of a trade secret by an ex-employee if

the employee entered into an enforceable restrictive agreement or was bound to secrecy by virtue of a confidential relationship existing between the employer and employee. Wexler v. Greenberg, supra.

8. Where a trade secret was not disclosed to the employee during his employment but was developed by him while pursuing his duties with the employer, an express or implied agreement of secrecy must be shown. Otherwise, such information forms a part of the technical knowledge and skill the employee has acquired by virtue of his employment and which he has an unqualified privilege to use. Wexler v. Greenberg, supra.

9. An implied agreement of secrecy may be inferred from the existence of a confidential relationship between the employer and an employee. Wexler v. Greenberg, supra.

10. The Pennsylvania courts have not articulated a standard for the duration of injunctions entered in trade-secret cases. Anaconda Company v. Metric Tool & Die Company, supra.

11. What in reality is protected in cases of this nature is not the product or process, but the secrecy of it. ILG Industries, Inc. v. Scott, 49 I11.2d 88, 273 N.E.2d 393 (1971).

12. Other jurisdictions have adopted the "independent development" test. Anaconda Company v. Metric Tool & Die Company, supra.

13. Under the "independent development" test the appropriate duration for injunction in trade-secret cases is the period of time it would take for one, either by reverse engineering or by independent development, to produce the product by lawful means. ILG Industries, Inc. v. Scott, supra; Schulenburg v. Signatrol, Inc., 33 I11.2d 379, 212 N.E.2d 865 (1965).

## DISCUSSION

Conflicting social and economic policy considerations arise in each trade-secret case. A business which invests time, money and manpower to develop secret advantages over its competitors must be afforded protection against the wrongful appropriation of secrets by a prior employee who was placed in a position of confidence. On the other hand, where the employer has no protectible trade secret, an individual who worked in a particular field of expertise cannot be compelled to erase from his mind the knowledge and skills learned through his employment. Our economic system is based upon competition and an individual has a fundamental right to follow and pursue the particular occupation for which he is best trained.

With these considerations in mind, we conclude from the foregoing facts and law that the computerized paste-weight and grid-weight control systems developed primarily by Slaton are GBC's trade secrets. Although the components are not unique or novel, the manner in which these computerized-based control systems in their completed state are either proposed or used, is unknown in the lead acid battery industry. GBC has spent considerable money in developing these systems; a substantial saving in its manufacturing process has been realized, giving GBC a competitive edge; the systems are of value to competitors and GBC has taken reasonable precautions to guard them from others.

This case is a bit unusual. Most cases involve misappropriation of pre-existing trade secrets (ones already developed or formulated and disclosed to an employee by his employer). In such cases, equitable relief is predicated upon the trust and confidence which the employer places in the employee by revealing the pre-existing trade secret to him. In other

words, it is the confidence placed in the employee by the employer which gives rise to an implied agreement of secrecy. Slaton argues that since he was in large measure the creator of these systems, GBC did not communicate them to him and, therefore, relief is unavailable. We disagree. A former employer can restrict his ex-employee's use of secrets he himself developed during his employment by express agreement, and the parties entered into one here. Slaton, as an incident to his employment, in writing agreed not to use or divulge to others secrets — including those he developed — after termination of his employment. Slaton's actions since leaving GBC show that he has violated his agreement by appropriating these systems and seeking to profit from them. We are, therefore, satisfied that GBC's right to equitable relief is clear and that Slaton has wrongly appropriated GBC's secrets.

Furthermore, we think GBC is entitled to preliminary injunctive relief. If we are wrong in our conclusion that GBC's right to equitable relief has been established, Slaton is protected by bond and will be entitled to damages. On the other hand, if we don't grant immediate relief, GBC will immediately lose its competitive edge and would realistically be unable to measure and prove damages. By granting preliminary relief the status quo is restored. GBC's secrets are protected and Slaton is not prohibited from working in his field of expertise; in fact, he is currently so employed.

We come then to the final and most perplexing question: should the duration of injunctive relief be limited in trade-secret cases? Pennsylvania has never addressed this question. In a case such as this where the parties did not fix a restrictive time period in their agreement; where the secrets were developed by the ex-employee within one year and where

it seems apparent that others will soon be able to produce them, we conclude that injunctive relief should be limited. At this time, of course, we are only to decide whether our preliminary injunction should be dissolved, continued or modified, but it is difficult to justify enjoining Slaton for a period of time longer than that required to produce the systems by lawful means either through reverse engineering or by independent development. And, as a practical matter, a longer period of time might be consumed before this litigation is finally resolved. Although this question was not raised and the present record contains no indication of the time so required, the testimony does reveal that GBC, through Slaton, developed the systems within a period of one year. There is no indication that it would take GBC's competitors more time to develop the same or similar systems. Accordingly, unless or until further evidence is presented on this question, we believe it is only fair to limit the preliminary injunction for a period of one year.

In ILG Industries, Inc. v. Scott, supra, the court, in arriving at a similar result, said:

"In many cases the question of whether a specific matter is a trade secret is an extremely close one, often not readily predictable until a court has announced its ruling. At the same time, the countervailing social and economic policy considerations relative to a person's right to pursue employment in a field in which he has expertise and knowledge cannot totally be cast aside:

"What in reality is protected in cases of this nature is not the product or process but the secrecy of it. (Citation omitted.) .... we believe commercial morality is preserved by preventing one from wrongfully using secret information for a period of time no longer than that required to discover or re-

produce that information by lawful means. Where that period can be ascertained, the defendant should be put out of business only for that length of time and, thus, be prevented from obtaining any advantage by the wrongful use of trade secrets." 273 N.E.2d at 398.

Finally, in light of the present record, we feel the scope of the original order must be narrowed.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter of this action.

2. The computerized paste-weight and grid-weight control systems involved in this action are GBC's trade secret which equity will protect.

3. Slaton in violation of his express agreement of secrecy has misappropriated said trade secrets.

4. GBC has established the necessary preliminary injunction prerequisites.

5. For the reasons discussed, this court's order of March 16, 1984, is hereby modified in scope and duration as follows:

## ORDER

December 12, 1984, the March 16, 1984 preliminary injunction order issued against defendant, Earl J. Slaton, is hereby modified as follows:

Until further order, for a period of one year commencing March 16, 1984, defendant Earl J. Slaton, his employees and/or agents, are preliminary enjoined from:

1. Directly or indirectly using or disclosing General Battery Corporation's computerized paste-weight and grid-weight control systems, including engineering drawings and any and all documents relating thereto.

2. Engaging in any employment directly or indirectly relating to equipment, processes and/or techniques for quality control in the lead oxide battery industry or any other such employment in the lead oxide battery industry which would create the risk that Slaton might disclose said trade secrets.

3. Offering service and/or accepting employment on a contract basis, or on any other type of per job basis is directly or indirectly relating to equipment, processes and/or techniques in the lead oxide battery industry, or engaging in any other such activity in the lead oxide battery industry which would directly and/or indirectly create the risk that Slaton might disclose said trade secrets; or offering services to any lead oxide battery manufacturer, which services would create the risk that Slaton would disclose to such competing battery manufacturer the said trade secrets.

Bond fixed in the amount of $500,000 remains.