**PLANT INDUSTRIES, INC., a Florida corporation, Plaintiff,**

**v.**

**William COLEMAN; Eugene Belk; Belk Fruit Packers, Inc., a California corporation, Defendants.**

**No. 67–1011–EC.**

United States District Court
C. D. California.

Feb. 1, 1968.

Lyon & Lyon, by Lewis E. Lyon and James L. Lyon, Los Angeles, Cal., for plaintiff.

Surr & Hellyer, by James R. Edwards, San Bernardino, Cal., for defendants.

MEMORANDUM OPINION FOR USE IN PREPARATION OF PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

CRARY, District Judge.

Plaintiff seeks to enjoin defendants from unfairly competing with plaintiff by the manufacturing and selling of citrus products which have been produced by the utilizing of plaintiff's alleged trade secrets, and for damages. In its Trial Memorandum, filed November 30, 1967, plaintiff asserts that said trade secrets are:

1. The entire process used by plaintiff in the preparation of sterile, citrus peel having a long storage life, and in its preparation of citrus peel base materials sold, which process includes and the particular elements of which and the sequence of use of which plaintiff claims are its trade secrets, and include- the processing of citrus peel to determine the thickness and the albedo content thereof.

2. The debuttoning of the citrus peel to remove the button, blemishes and other unwanted or degraded or spoiled peel.

3. The passing of the citrus peel so debuttoned through mechanism to separate out button fragments and other unwanted citrus peel fragments.

4. Removing juice from the peel by washing the peel, i. e., the juice left on the peel after the orange juice has been removed from the peel.

5. The fact of the use of the Toman slicer, its manner and speed of operation and the use of water in conjunction therewith during which the peel is sliced vertically to determine the vertical thickness of the peel at high commercial speeds and wherein a bitterness causing precursor is washed from the peel, and which enables the bitterness of the peel ultimately produced to be established.

6. The passing of the peel over a separating means to separate the water from the peel and to further separate from the wanted peel unwanted slivers or fragments of peel.

7. The particular cooking process employed by the plaintiff wherein the peel and other ingredients such as citric acid are added to the peel,. the time of such cooking, the canning of the peel in five-gallon cans at a particular elevated temperature after which the canned peel is placed in storage and during which storage, due to the elevated temperature of the peel in the cans, the processing of the peel continues.

This Court has jurisdiction under the provisions of Title 28, United States Code, Section 1332, diversity of citizenship.

The parties have agreed to certain facts as per statement filed November 20, 1967, whereby, among other things, it was agreed plaintiff acquired California Citrus Pulp Company, a Florida corporation, (hereafter referred to as Cal Citrus) about November 23, 1964, and plaintiff now has a place of business in Colton, California, where it processes citrus peel and other products by the methods substantially as acquired from Cal Citrus. Prior to purchase of Cal Citrus plaintiff had investigated numerous sources, throughout this and foreign countries, for citrus peel to be used in the making of marmalade. It was further agreed that Cal Citrus was producing citrus peel unlike any it was able to find available from any other source. In order to obtain for itself and its subsidiaries a continuous supply of such peel, plaintiff purchased Cal Citrus and all of its assets and the business of Cal Citrus was thereafter continued as a division of plaintiff in the processing and production of citrus peel by said plaintiff.

The defendant, William Coleman, was employed by Cal Citrus from 1946 to his resignation in August, 1966. He was at all times here involved, and now is, the husband of the niece of Narvol Rich Johnson, one of the organizers and principal owners of Cal Citrus for many years prior to and at the time of its purchase by plaintiff.

Prior to August, 1966, defendant Eugene Belk offered to employ the defendant Coleman when and if he left the employment of Cal Citrus, then owned by plaintiff.

Prior to August, 1966, defendant Coleman showed defendant Belk a jar of citrus peel produced by Cal Citrus.

In June of 1950 Edward J. Toman was issued Patent No. 2510435 covering a fruit and vegetable slicer. As used hereafter the term "Toman slicer" shall refer to the slicer manufactured pursuant to such patent.

Prior to June 16, 1966, defendant Coleman ordered a Toman slicer and paid Toman $500, which he obtained from defendant Belk, on account, for the slicer so ordered. On August 12, 1966, defendant Belk paid Toman the balance of the amount due on the slicer, to wit, $1,590.96.

Plaintiff, since about 1950, has used a Toman slicer in the manufacture of

sliced citrus peel and in processing the peel through the slicer has used water under domestic water pressure.

Prior to the defendants' purchase and use of a Toman slicer, no Toman slicer had been used or placed in operation by anyone other than Cal Citrus. The slicer, as purchased by defendants, had no provision for the use of water and there was no cover on the slicer when it was delivered.

Defendants received and discussed letter dated November 14, 1966 (Pltf.'s Ex. 22), written by plaintiff's counsel, Lyon & Lyon, but did not reply to said letter. Defendants, prior to the reading of said letter, had not processed for sale any sliced citrus peel. Said letter demanded that defendant Coleman make written assurances to plaintiff that he would respect plaintiff's trade secrets and the confidence and trust placed in him during his employment at Cal Citrus and would not appropriate such confidential information or trade secrets for his own benefit or the benefit of others.

Since May 31, 1967, defendants have produced for sale 11,000 five-gallon cans of sliced citrus peel.

Defendant Belk entered into a letter agreement, dated May 31, 1967 (Pltf.'s Ex. 9), with Vita-Pakt Corporation in order to provide a sales outlet for sliced citrus peel.

The Toman slicer, and other equipment to process sliced citrus peel, was set up in defendants' plant after January of 1967. As a part of such equipment there was added to the Toman slicer a water spray which operated under the pressure existent in the pipe line. This water spray was installed under the direction of and by defendant Coleman.

Defendant Coleman has called upon Knott's Berry Farm and Stone Cellars Kitchens, which were accounts of Cal Citrus, and sliced peel produced by defendants was presented to Knott's Berry Farm and Stone Cellars Kitchens. Throughout his employment with Cal Citrus and plaintiff, defendant Coleman kept a notebook; for example, see Pltf.'s Ex. 23.

Prior to August, 1966, defendant Coleman knew of notices placed at the entrance to the processing operations of Cal Citrus refusing admittance (Exhibits 2A–E to the deposition of defendant Coleman, Pltf.'s Ex. 3).

■ After consideration of all of the evidence, including the above referred to stipulated facts, it appears to the Court that the principles of vacuum packing for preservation, debuttoning of citrus peel, moving citrus peel by mechanical device through mechanism to separate the said button fragments and other unwanted peel fragments from the peel, washing the peel, slicing the peel, separating water from the peel by various means, including Sweco shaker, passing of peel over agitating screens, the moving of the peel for various types of processing by conveyor belts and screen type conveyors, and the use of water and cooking to eliminate bitterness, are all generally known in the trade and industry of processing citrus peel for various purposes, including marmalade, and are not trade secrets of plaintiff.

■ However, the question remains as to whether the particular manner, means or formula and know-how, used by Cal Citrus and plaintiff to produce the end product of the processed citrus peel was secret and confidential as between Cal Citrus, plaintiff, and defendant Coleman. Did such process and know-how constitute trade secrets to the extent that it constituted a competitive advantage over competitors who did not know of the manner in which certain steps in the processing were accomplished.

In determining the rules to be applied, we must first consider whether the plaintiff seeks to protect a design secret with respect to the modification and manner of use of water with the Toman slicer and, if so, would such design be disclosed to anyone purchasing such a slicer. The Toman slicer was a patented

device and therefore, as such, would not be a trade secret.

It is also important to determine whether the defendant Coleman acquired the alleged trade secrets, as to use of water with the Toman slicer and the formula used in cooking and processing the peel after the slicing and dewatering operation, as a result of *his own efforts* while in the service of Cal Citrus and plaintiff or by way of disclosure to him by Cal Citrus or plaintiff while he, Coleman, was an employee.

The California Court of Appeals, in the case of Futurecraft Corporation v. Clary Corporation and Roderick Koutnik, 205 Cal.App.2d 279, 23 Cal.Rptr. 198, at page 211, quotes from an article of Mr. Julian O. von Kalinowski in 47 Virginia Law Review, 583, at page 599, as follows:

> " 'Protection should be afforded when, and only when, the information in question has value in the sense that it affords the plaintiff [i. e. ex-employer] a competitive advantage over competitors who do not know of it [i. e. the trade secret], *and where the granting of such protection will not unduly hamstring the ex-employee in the practice of his occupation or profession.* This simple balancing process will invariably protect all of the pertinent interests—those of the former employer, of the former employee, and of the public.' (Emphasis added.)"

Futurecraft, supra, involved an action for unfair competition, for an injunction and damages. The defendant employee, an engineer, was alleged to have wrongfully used and disclosed a certain valve *design* claimed to have been confidential to and the trade secret of Futurecraft. The judgment in favor of the defendants was affirmed on appeal. The Court observes at page 206 of 23 Cal.Rptr. of the opinion:

> "Plaintiff's case does *not* involve a claim of a trade secret alleged to exist in the know-how; nor the process under which the valves were made; nor

any machine; nor the tools used in the process of manufacture of the valve. This is not a know-how case or a case arising out of alleged trade secrets which underlie the manufacture of the valves in issue. Nor does plaintiff complain of any improper disclosure by Koutnik of assertedly confidential information while he was in the employ of plaintiff. The basis of plaintiff's claim for relief is, as set forth in the opening brief, '(1) that the various *design features* are protectible trade secrets, as such, and (2) that, at any rate, Koutnik had expressly agreed that he would not utilize these designs (and particularly the paragraph V design) in competition with Futurecraft.' (Emphasis added.)"

Defendant Koutnik had been employed by Futurecraft intermittently from 1949 to March, 1956, full time from July 1, 1951, to April 25, 1952, and January 31, 1953, to March 17, 1956, in developing the valves involved and valve components (page 206).

The trial Court found that when defendant entered the employ of Futurecraft

> " '\* \* \* he carried with him a good deal of knowledge concerning the art, science and mechanics of valve design and manufacture, and a good deal of skill in the application of that knowledge \* \* \* [and that] [m]uch, probably most, of that knowledge had been acquired at the Jet Propulsion Laboratory of the California Institute of Technology \* \* \*.' (See finding 2, footnote 2.)" (Page 207.)

At pages 208–210 of its opinion, the Court cites and discusses at length the case of Wexler v. Greenberg, 399 Pa. 569, 160 A.2d 430. In Wexler, defendant Greenberg was a qualified chemist. He worked for plaintiff for eight years. In August, 1957, he left plaintiff and went to work for defendant corporation (Page 208 of 23 Cal.Rptr.).

Wexler "* * * sought to enjoin the defendants from disclosing and using certain formulas and processes pertaining to the manufacture of certain sanitation and maintenance chemicals which plaintiff claimed to be its trade secrets." (Page 208.)

The Supreme Court of Pennsylvania affirmed the ruling of the trial Court that certain of the formulas were trade secrets of plaintiff but reversed the judgment for plaintiff pointing out that the formulas were not disclosed to Greenberg by plaintiff but had been developed by him or under his supervision while in the pursuit of his duties as plaintiff's chief chemist. The Court then observed:

" 'We are thus faced with the problem of determining the extent to which a former employer, *without the aid of any express covenant* [italics shown], can restrict his ex-employee, a highly skilled chemist, in the uses to which this employee can put his knowledge of formulas and methods he himself developed during the course of his former employment because this employer claims these same formulas, as against the rest of the world, as his trade secrets.

    *    *    *    *    *    *'

"The court, after noting the fact that there was no covenant between Buckingham and Greenberg and, as indicated above, having assumed that some of the formulas were trade secrets of Buckingham, stated:

" '* * * The sole issue for us to decide, therefore, is whether or not a confidential relationship existed between Greenberg and Buckingham binding Greenberg to a duty of non disclosure.

'The usual situation involving misappropriation of trade secrets in violation of a confidential relationship is one in which an employer *discloses to his employee* a pre-existing trade secret (one already developed or formulated) so that the employee may duly perform his work.' " (Page 208.)

It is to be noted that in the instant case, as in Wexler, there was no expressed covenant between defendant Coleman and Cal Citrus or plaintiff. This leaves the question of whether there was an implied confidential relationship between Coleman and plaintiff or Cal Citrus binding defendant to nondisclosure. Also to be considered is whether plaintiff has certain trade secrets within the knowledge of defendant Coleman and to what extent, if any, he may be privileged to use them by reason of there being no covenant not to disclose, and the further matter of whether the alleged confidential information, within the knowledge of Coleman, was acquired by him as a part of his own efforts and as a result of knowledge and skill acquired as an employee of Cal Citrus and plaintiff, or originated with plaintiff or Cal Citrus.

In Wexler, supra, the Court determined that Greenberg was privileged to use the secret formulas by reason of no covenant not to disclose trade secrets and Greenberg's right to practice his occupation or profession and his right to use the knowledge and skill acquired before employment by plaintiff and that acquired while employed by plaintiff which was not confidential and which, if disclosed, would not result in the violation of a trust imposed by reason of the confidential nature of the information acquired while in defendants' employ (Futurecraft, pages 210–212).

In addition to the points to be determined, as discussed above, there is the issue of whether plaintiff and Cal Citrus *kept secret* the phases of processing citrus peel and formulas which might be determined to be trade secrets of plaintiff. As stated by the Court in Futurecraft, supra:

"'* * * California has adopted the broad approach set forth in Restatement, Torts, Volume 4, section 757, comment b, page 5 * * *.' "

The said section is entitled "Definition of trade secret" and under a subpara-

graph entitled "Secrecy" the treatise states:

"The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. * * * Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

"*Novelty and prior art.* A trade secret may be a device or process which is patentable; but it need not be that. It may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement that a good mechanic can make. Novelty and invention are not requisite for a trade secret as they are for patentability." (See also Futurecraft, page 211.)

Applying the rules as set forth above, and with particular reference to the observations of the California court and the Restatement of the Law of Torts as adopted by the California court, to the facts presented by the evidence in the case at bar, the Court finds:

(1) The information relative to the manner and means of the use of water in the operation of the slicer was disclosed to defendant Coleman by Cal Citrus and not acquired by him as a result of his testing and experiments. The evidence also discloses that no one in the processing of citrus peel other than Cal Citrus had used, prior to defendants' use, a Toman slicer or water in the slicing process. The use of water in the manner applied by Cal Citrus afforded it an advantage over competitors, none of whom knew of such use or the benefits to be derived therefrom, and the Court concludes that use of the Toman slicer and water was a trade secret.

(2) The formulas, such as details for processing various citrus peel through the cookers, as kept by defendant Coleman in his notebook, Exhibit 23, contained confidential information which constituted trade secrets. These secrets involve the proportions of the materials used, time for cooking, and so forth, and was information disclosed to the defendant Coleman by Cal Citrus and not the result of his experimentation or skill.

Although the general approach by plaintiff to the processing of citrus peel involved general concepts which were not trade secrets, the particular manner and means of embodiment of those concepts in certain phases of plaintiff's process, the Court concludes, were trade secrets.

(3) The defendant Coleman, although not bound by written agreement not to disclose trade secrets, knew that the information as to the details of the method and know-how of processing citrus peel by Cal Citrus and plaintiff, particularly the slicing procedure and cooking formulas for different products and customers, was confidential and there was an implied obligation on his part not to disclose this confidential information received by him in trust.

(4) That Cal Citrus and the plaintiff maintained sufficient secrecy with re-

spect to the trade secrets referred to above to protect the information. Not only were there several signs on entrances to the plant and properties denying admittance thereto but Mr. Hanson, of the plaintiff corporation, stated that he had difficulty in getting into the plant to talk to Mr. Philipson, and the fact it appears no competitor had learned of the details of Cal Citrus' processing of citrus peel, all points to the fact that conscientious efforts were made to maintain secrecy.

Cal Citrus had allowed the members of one or more women's clubs and children to walk through its plant and representatives of two or three of their customers had been through to check on the product they were purchasing but these facts are not considered as constituting failure to maintain secrecy as to the trade secrets here involved.

(5) The trade secrets and confidential information were of substantial value to the plaintiff and Cal Citrus and to competitors, as the evidence discloses that the plaintiff was unable to obtain processed citrus peel of the quality and likeness of that produced by Cal Citrus and, in order to learn how to make such a product, purchased the assets of Cal Citrus. It is also to be noted that the defendant Belk very frankly stated that he was aware that the process used by Cal Citrus was of a confidential nature and that he employed defendant Coleman because of the slicer that Coleman said he had built. This slicer turned out to be a Toman slicer with water attachment so that water could be used under ordinary pipe pressure in connection with the operation of the slicer, similar to the arrangement as used by plaintiff.

It appears that the peel enters the slicer used by Cal Citrus and plaintiff from a funnel type piece of equipment placed on an angle to the slicer (Pltf.'s Ex. 26–G), whereas the peel in the defendants' process enters the slicer from a horizontal belt.

(6) With respect to the ease or difficulty with which the information could be properly acquired or duplicated by others, the Court concludes that one skilled in the trade of processing citrus peel and familiar with the equipment used therein could in due time discover plaintiff's formulas, its means and know-how, with respect to the processing of citrus peel through a slicer using water for a propellent and, if desired, for debittering the peel in the process.

It appears to the Court that one skilled in the trade would be able to learn of the Toman slicer and plaintiff's use thereof through checking patents on fruit slicers, inquiring of patentees of such slicers, and by inquiry of persons knowledgeable with respect to slicers and their capabilities, including Mr. Toman as a patentee. Information as to dimensions of the peel and the amount of albedo left on processed peel was available by examination of plaintiff's peel as contained in its products in which the peel in its various dimensions was an ingredient.

Mr. Roy, an employee of Cal Citrus from 1939 to 1951, testified that water was applied to the slicers used by Cal Citrus from shortly after he was employed by that company, for the purpose of moving the peel through the slicer so as to avoid the need of putting hands near the whirling blades of the slicer when the peel piled up in front of or clogged the machine. In the first instance the use of water was not to eliminate bitterness but to avoid the need for employees to put their hands near the slicer blades. Mr. Roy stated that on two occasions prior to the application of water, employees had suffered injuries to their hands from the slicer blades. It does not appear that any substantial length of time was involved in finding that water under normal pipe lines pressure would accomplish this desired result.

Mr. Higby, for many years a research chemist with Sunkist Growers and chief chemist at the Exchange Orange Products Company, testified relative to the problems that would be involved in

trying to determine how to process citrus peel, particularly Valencia and Navel orange peel, to obtain a product similar to plaintiff's (R.T., Vol. 3, page 387, line 7, to page 396, line 17). He said that the major problem would be to get the peel sliced thin. He thought he would have a fifty per cent chance of working out a process in, say a year. That would be the laboratory process and would not include developing machinery for handling the peel or packaging the peel (R.T., page 396, lines 4 to 10). Mr. Higby also observed that if working with mature Valencia oranges, the laboratory work would be less important because bitterness is a minor factor in mature Valencias.

As noted above, the thickness of the citrus peel produced by Cal Citrus and plaintiff, and its length as used in different products, such as marmalade, and the thickness of the albedo left on the peel, could readily be determined by examination of the products in which plaintiff's peel was used and this information did not constitute a trade secret.

The Court does not find that Cal Citrus, when first applying water, used it through the slicer to eliminate precursors, limonin or oils in the peel. As noted above, the water, at that time and since, was for the purpose of avoiding recurrence of accidents which had involved the mangling of fingers.

The Court concludes that the removal of the bitterness by the water operating into the slicer is the result of the precursor oils or other chemicals in the albedo and flavedo being soluble in the water or being removed in part by the force of the water. The use of water as applied by Cal Citrus was not the result of long experiments or testing to accomplish the debittering result obtained. It was the natural consequence, opportunely discovered by Cal Citrus. This fact does not keep it from being a trade secret if the information meets the other tests noted above.

The fact that the precursors and limonin in citrus peel were soluble in water was not a trade secret, since Mr. Higby, in 1938, had written an article widely distributed in chemical circles entitled "The Bitter Constituents of Navel and Valencia Oranges", in which this fact is discussed (Pltf.'s Ex. 2).

The Court concludes that plaintiff was possessed of trade secrets and confidential information consisting of:

1. The use and the manner and means of the use of a Toman slicer and application of water thereto, including the amount of water, pressure used and where and how applied in the processing of citrus peel by plaintiff.

2. Formulas for the cooking of peel. This does not include the use of citric acid, which was well known in the trade, but does include the measure of ingredients and other data relative to cooking the peel taken to defendant Belk Fruit Packers, Inc., by defendant Coleman.

The Court further concludes that the trade secrets were divulged to defendant Coleman by Cal Citrus on a confidential basis and have been so maintained by plaintiff. It appears to the Court that defendant Coleman did disclose the said trade secrets of plaintiff to defendants in violation of a confidential relationship between Mr. Coleman and plaintiff and that the trade secrets are now being unfairly used by defendants in competing with plaintiff.

An obligation not to disclose confidential information may arise from circumstances other than communications in confidence to the employee by the employer. It may also rest upon an express or implied agreement. An implied agreement not to disclose could well have arisen from the efforts of Cal Citrus to maintain secrecy and defendant Coleman's knowledge that Cal Citrus' methods of processing citrus peel were not to be disclosed (Pltf.'s Ex. 3, page 92, line 22, to page 93, line 10).

No one else in the field of processing citrus peel had obtained plaintiff's result in processing such peel. Therefore, we

should assume that had Coleman worked for other processors he would not have acquired the knowledge he now asserts the right to use.

It does not appear that the means of keeping the peel for a period of years in vacuum packed containers was the discovery of Cal Citrus. Vacuum packing was not a trade secret. Cal Citrus did solve the problem, although by chance, of eliminating the precursors and limonin from the albedo and certain oils and chemicals from the flavedo which allowed the peel to be vacuum packed without the bitterness and off-flavor which normally developed in the fresh peel within about seven days.

The fact water was sprayed into an item of equipment used in the processing of the peel was apparent to one passing through the plant, but the slicer was covered and the fact the water was sprayed into a slicer or that the slicer was a Toman slicer was not apparent to one passing through the plant, by reason of the covering of the slicer and the approaches thereto as evidenced by plaintiff's Exhibit 26–G.

It is true that Cal Citrus had developed a process whereby it obtained a result not yet discovered by others. Mr. Hanson had endeavored to find a product like the peel processed by Cal Citrus, both in the United States and abroad, but the evidence does not disclose what, if any, efforts, by way of tests or research, he or his employers made or accomplished to duplicate the peel.

Samples of the peel, both before and after processing by Cal Citrus and plaintiff, being available, the Court concludes that one skilled in the trade of processing citrus peel could, with concerted effort, discover, by research and tests that his experience would dictate, the chemical and mechanical process to duplicate the end result of plaintiff's processed peel. In considering this point, we must, of course, keep in mind the volume of information available in this field to the public as noted above and by Mr. Higby in his testimony.

Plaintiff's process would be classified as "simple" by modern science and industry. Mr. Higby, the expert research chemist, believed the slicing of the peel to so thin a dimension would be the biggest problem (R.T. Page 389, lines 12 to 22). To a mechanical engineer experienced in the field of slicers of various kinds, it should not present an insoluble problem. Mr. Higby was of the opinion that the processing from a chemical standpoint did not present a serious problem (R.T., page 394, lines 20 to 25).

Considering all of the evidence in the case, the Court concludes that a reasonable period of time which should be allowed for discovery of plaintiff's trade secrets is 18 months from the date of this Opinion.

For the reasons noted hereinabove, plaintiff is entitled to an injunction against defendants, their agents and representatives, enjoining their use of trade secrets and confidential information as described herein and from disseminating any information with respect thereto for a period of 18 months to run from the date of this Opinion, to wit, February 1, 1968. National Rejectors, Inc. v. Trieman, Mo., 409 S.W.2d 1, 43; and Schulenburg v. Signaltrol, Inc., 33 Ill.2d 379, 212 N.E.2d 865, 869–870.

Plaintiff is entitled to Judgment for damages, if any, suffered to date as a result of defendants' use of its trade secrets, and costs of the within action.

The Court does not conclude that there was deliberate wrong or fraud on the part of defendants in the appropriation of plaintiff's trade secrets.

Plaintiff is requested to prepare, serve and lodge proposed Findings of Fact and Conclusions of Law and Judgment.

This Memorandum is not to be deemed a final Judgment.