**SI HANDLING SYSTEMS, INC.**

v.

**Michael E. HEISLEY, Heico, Inc., Philip L. Bitely, Richard O. Dentner, Eagle Sheet Metal Mfg. Co., Inc., Thomas H. Hughes, Sy-Con Technology Inc., Russell H. Scheel, Stanley K. Gutekunst, Barry L. Ziegenfus, Frank W. Possinger.**

**Civ. A. No. 83–1336.**

United States District Court, E.D. Pennsylvania.

Nov. 7, 1986.

---

11. The plaintiff can certainly pursue his breach of contract claim with the State Common Pleas Court.

E. Jerome Brose, Easton, Pa., Patrick T. Ryan, Philadelphia, Pa., for plaintiff.

Gerald D. Hosier, Bruce S. Sperling, Gerald D. Mindell, Chicago, Ill., Steven Williams, Philadelphia, Pa., Daniel B. Huyett, Reading, Pa., for Heisley, et al.

## MEMORANDUM AND ORDER

TROUTMAN, Senior District Judge.

This case, now before the Court for consideration of defendants' motion for summary judgment, involves complex questions of liability for alleged misappropriation and misuse or trade secrets, breach of contract, interference with contract, conspiracy, antitrust violations and RICO violations.'

The trade secret issues were the subject of a twenty-nine day hearing on plaintiff's application for a preliminary injunction. Defendants seek summary judgment on all claims asserted by the plaintiff.

In large part, all of plaintiff's claims are based upon or derived from the allegation that defendants misappropriated and wrongfully used plaintiff's proprietary information, including trade secrets, to build a competitive business.

Before considering defendants' contentions, we shall review the applicable summary judgment standards because some of defendants' arguments and contentions seem to rest upon an erroneous view of the respective burdens resting upon the parties and the proper role of the Court in considering the instant motion. In addition, to clarify the issues, we shall briefly relate the procedural history of the case, particularly as it concerns the granting of a preliminary injunction in March, 1984, and its

termination in March, 1985. We do so because the defendants repeatedly rely upon said order, contending it is dispositive of various issues.

Accordingly, we note the two essential conditions which must exist before summary judgment may properly be granted under Fed.R.Civ.P. 56, *viz.*, the absence of genuine issues as to material facts and the movant's entitlement to judgment as a matter of law.

In two recent cases, the Supreme Court reiterated the need for the party opposing summary judgment to produce some evidence which could support a favorable jury verdict when confronted with competent evidence produced by the movant in support of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court reemphasized that the trial court must neither weigh the evidence produced by the parties, nor conduct a "trial on affidavits". *Anderson,* —— U.S. at ——, 106 S.Ct. at 2513–14, 91 L.Ed.2d at 216.

■ The party opposing summary judgment may show the existence of genuine issues of material fact "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves". *Catrett,* —— U.S. at ——, 106 S.Ct. at 2554, 91 L.Ed.2d at 275. Thus, affidavits in support of summary judgment possess no talismanic significance as compared to other kinds of evidence. The party opposing the motion is not required to produce counter affidavits so long as he is able to show the existence of genuine issues of material fact by other proper means. Moreover, any affidavits produced by either party must meet the standards set forth in Rule 56(e), *i.e.,* that the affidavits contain facts admissable in evidence, be made on personal knowledge, and show that the affiant is competent to testify to the matters set forth therein.

■ Finally, even if the movant succeeds in establishing that there is no material issue of fact in dispute or, as sometimes occurs, if the movant concedes that the opposing party's version of the facts is accurate, he must then demonstrate that he is entitled to judgment as a matter of law. This is usually accomplished by citing relevant precedent to convince the Court that there is no legally cognizable theory upon which the opposing party could obtain a judgment in his favor. Stated another way, it will avail the proponent of summary judgment nothing to establish the lack of a factual dispute if the issue in question is not an essential element of the opponent's claim or defense, *i.e.,* is not material or is not otherwise legally determinative of the outcome of the case.

With these standards in mind, we turn to a brief summary of the history of this case with respect to the preliminary injunction and its aftermath.[1]

In March, 1984, the Court issued a preliminary injunction prohibiting the defendants from engaging in that aspect of the materials handling industry which would utilize the car-on-track technology developed by plaintiff SI Handling. Upon appeal, the case was remanded for the entry of a more narrowly drawn injunctive order to conform to the Third Circuit Court of Appeals' determination that some of the "trade secrets" as determined and identified by this Court were not legally cognizable as such under the law of Pennsylvania. *See, SI Handling Systems, Inc. v. Heisley, et al.,* 753 F.2d 1244 (3d Cir.1985).

In attempting to "recast" the preliminary injunction order, we properly considered the opinion of the Court of Appeals with respect to the desirability of so-called "lead-time" injunctions. *Id.,* at 1266. Ultimately, we dissolved the preliminary injunction on March 27, 1985, after it had been in effect for approximately thirteen months. That decision is the first of defendants' several purported independent bases for summary judgment as to plain-

---

1. The facts of the case are set forth in detail in the Memorandum accompanying the preliminary injunction order. *SI Handling Systems,* *Inc. v. Heisley, et al.,* 581 F.Supp. 1533 (E.D.Pa. 1984).

tiff's trade secret claims. Accordingly, it is there that we begin our detailed consideration of defendants' motion.

## I. Reverse Engineering

 Whether CARTRAC can be reverse engineered is a question of fact. At the preliminary injunction stage of the controversy, this Court and the Circuit Court of Appeals were required to determine the facts established by a limited record and for the sole purpose of determining the issue of injunctive relief. This Court, affirmed by the Circuit Court, found and concluded that plaintiff had supported its claim that it possesses certain described trade secrets which were misappropriated by the defendants. Presently, in deciding whether to grant defendants' motion and remove some or all of the plaintiff's claims from a jury's consideration, we are obliged to determine, without reference to the prior findings of this Court and the Circuit Court, whether there are any genuine issues of material fact in dispute requiring the findings of a jury. Stated another way, we decide only whether there is sufficient conflict in the record before the Court to require a jury determination that SI has satisfied all the prerequisites for trade secret protection. *Anderson v. Liberty Lobby, Inc., supra.* The issue, whether CARTRAC can be reverse engineered, is but one aspect of that factual inquiry.

The defendants erroneously argue that our decision dissolving the preliminary injunction has negated plaintiff's trade secret claims, despite the affirmance by the Court of Appeals of eight trade secrets identified by this Court. Defendants erroneously characterize our use of the term "reverse engineering" as a "holding" that SI's CARTRAC product can be reverse engineered and is thus not entitled to trade secret protection under the law of Pennsylvania. Again the defendants ignore, as already stated, that this Court was there determining the issue of injunctive relief in the light of equitable principles particularly applicable to preliminary injunctive relief.

Contrary to defendants' assertions, the testimony which they characterize as an admission by SI that CARTRAC is susceptible to reverse engineering, and referred to by the Court in terminating the preliminary injunction, is not conclusive on that issue. While it is true that one of plaintiff's witnesses, Robert Hale, testified that CARTRAC could be reverse engineered and this Court referred to that testimony in attempting to determine a proper "life-span" for injunctive relief, the testimony and our use of it must be placed in context.

In the first instance, defendants' counsel defined the term "reverse engineering" for the witness:

Now, Mr. Hale, if a group of engineers—and I will assume they have no experience in the material handling industry, or at least in the car-on-track-type industry—if a group of engineers were given the opportunity to take a car-on-track system apart and measure its various components and see it in operation, could they, on the basis of those measurements and that inspection, reverse engineer it *to the extent that they could then design and produce drawings for an operational system? Now, remember, when I said operational system, I said a system that works, moves something from one place to another, not as well necessarily as SI's system functions and as long as SI's system.*

(Preliminary Injunction Hearing Transcript, Vol. XIV at 100, 101.) (Emphasis added). Counsel for the defendant did not ask whether the engineers he described could produce an actual working system. Rather, he asked whether the engineers could, from a working model, produce drawings from which a similar system could be built. Hale's affirmative answer to that question cannot be construed as an abandonment of SI's position that CARTRAC embodies trade secrets which would not be disclosed even if a competitor were to dismantle a CARTRAC system, measure and test its component parts and even build an exact duplicate of it. Indeed, elsewhere in his testimony, Hale was specifically asked whether certain aspects of the CARTRAC system were disclosed and could be copied from it and he answered those queries in the negative. (*See, e.g.,*

Preliminary Injunction Hearing Transcript Vol. X at 46, 64; Vol. XI at 30, 89; Vol. XIII at 29). How such conflicting testimony should be construed is an issue of fact, not to be resolved by the Court on a motion for summary judgment.

Second, our reference to Hale's testimony was not a holding that CARTRAC can be reverse engineered in the sense that all of SI's claimed trade secrets could be duplicated by tearing down the product. This Court was instructed by the Circuit Court to consider the proper life span of injunctive relief in this case. We were required to strike a balance among competing interests, as noted in our Memorandum and Order of March 27, 1985.

The situation we faced was unique, with no easy or precise solution. On the one hand, we had determined that SI had protectible trade secrets, the use of which by defendants could be enjoined. On the other hand, the individual defendants were instrumental in developing the system which embodied the trade secrets. Presumably, with their expertise and training, the use of which *could not* be enjoined, they would be able to solve the same problems and come to the same juncture in the development of a spinning tube, car-on-track materials handling system at which SI had arrived, albeit with a lower investment of time and money. The injunction that was in place for over a year was the only remedy at our disposal to compensate SI for the shorter development period available to the defendants.[2]

At the heart of the matter in 1985 was the determination of an appropriate period of time for continued injunctive relief.

Having already rejected the testimony of defendants' expert that the CARTRAC system could be reverse engineered in an exceptionally short period of time, we necessarily turned to the testimony of Robert Hale, the plaintiff's witness. Although we used the terminology employed by counsel, i.e., "reverse engineering" it occurs to us that the term "re-engineer" might better describe what we are seeking to express. In any event, that phase of the litigation is concluded. The Court is no longer the fact finder. Therefore, defendants' attempts to transmute our efforts into both a factual determination and a conclusion of law upon which they may obtain summary judgment is simply overreaching.

## II. Other Trade Secret Issues

Defendants have also advanced additional theories upon which they contend summary judgment should be granted as to plaintiff's trade secret claims. Most depend upon what defendants characterize as incontrovertible facts contained in various depositions and affidavits. For the reasons that follow, we conclude that defendants have failed to establish the absence of genuine issues of material fact and have, accordingly, failed to demonstrate that they are entitled to judgment as a matter of law as to SI's trade secret claims.

### A. Identification of Trade Secrets; Proof of Defendants' Use Thereof.

Defendants contend that SI cannot or will not identify and specify the trade secrets it claims defendants have misappropriated. In addition, they have produced

---

**2.** Whether the plaintiff is entitled to compensation for defendants' allegedly lower research and development expenditures and, if so, how much compensation is due, awaits a jury's resolution of the trade secret and other claims asserted by the plaintiff.

Undoubtedly, plaintiff considers an injunction, limited in time, coupled with the possibility of monetary damages "rough justice" indeed in light of its belief that defendants' actions were morally as well as legally reprehensible. Allegations as to the immorality of defendants' conduct must be made in, and proven injuries redressed by, a "Higher Court", of unlimited jurisdiction and presumably possessing more

accurate methods for assessing truth, as well as a far wider range of remedies. The legal and equitable remedies discussed herein must suffice in this imperfect world in which plaintiff is relegated to a Court of limited jurisdiction and correspondingly limited remedies. On the contrary, the defendants undoubtedly consider any relief an injustice, contending, as they do, that they did nothing more than use their own knowledge and experience and, with certain exceptions, chose their own work place, exercising the freedoms constitutionally guaranteed in our great but litigious society. They too are relegated to a Court of limited jurisdiction and limited remedies.

the affidavits of six individual defendants, all of whom aver that they were unaware of SI's claims to trade secret protection for any aspect of its CARTRAC product and that, in any event, none of SI's trade secrets were used in their ROBOTRAC product. (Exhibit Q to "Defendants' Memorandum of Law in Support of the Motion for Summary Judgment", Doc. # 234)

■■■ Defendants do not support their argument that plaintiff's alleged failure, to date, to specify their claimed trade secrets to defendants' satisfaction entitles them to judgment as a matter of law. Such a requirement has not been imposed by Pennsylvania law, or by the Third Circuit. *Rohm and Haas Co. v. Adco Chemical Co.*, 689 F.2d 424 (3d Cir.1982). Thus, even if true, defendants are not entitled to summary judgment on that basis. Defendants' contention is also belied by the fact that this Court, as well as the Circuit Court, was able to identify, from the testimony presented at the preliminary injunction hearing, several discrete elements of CARTRAC which were entitled to trade secret protection. Further, we are puzzled as to the ability of some defendants to present sworn affidavit testimony that they never used the "trade secrets" which they also claim were not and cannot be identified. Moreover, as a practical matter, a jury may not have to be as precise as the Court needed to be in identifying the trade secrets. At trial, the inquiry may be less specific in that the jury will have to decide whether CARTRAC contains trade secrets without necessarily specifying in precise detail what they are. It will, of course, be the Court's task to be certain that the

plaintiff has put into the trial record sufficient evidence from which the jury can properly find that CARTRAC contains trade secrets which the defendants misappropriated before allowing the case to go to the jury.[3]

■■■ The affidavits which purportedly support defendants' contention that they were unaware of SI's claims to trade secret protection are unavailing for two reasons. First, some of the affidavits are, in part, based upon personal *belief,* not personal *knowledge* as to the existence of certain alleged trade secrets embodied in CARTRAC. As such, those affidavits are legally insufficient to support summary judgment. (See, *e.g.,* Affidavits of Stanley Gutekunst, Russell Scheel and Barry Ziegenfus, referring to fit, dimensions and tolerances between the drive tube and tube plug, Exhibit Q to Defendants' Motion for Summary Judgment, Doc. # 234). Second, and more important, all of the affidavits have been sufficiently countered by other evidence of record so as to preclude the granting of summary judgment in favor of the defendants.

This case is in the unusual posture of having had the sufficiency of the evidence through which plaintiff proposes to establish the elements necessary to support its trade secrets claim analyzed for a different purpose, *i.e.,* injunctive relief, at both the trial and appellate levels. None of the factual findings upon which this Court relied in granting the motion for a preliminary injunction were held to be clearly erroneous by the Court of Appeals.[4] That evidence is already on the record in this

---

**3.** Although in *Anderson* and *Catrett,* the Supreme Court held that the standard to be applied in deciding a motion for summary judgment is the same as that applied to a motion for a directed verdict, we do not understand the Court to mean that the denial of a motion for summary judgment automatically precludes the subsequent granting of a directed verdict. On summary judgment, the party opposing the motion need not "produce evidence in a form that would be admissable at trial in order to avoid summary judgment". *Catrett,* — U.S. at —, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. Nor do we believe the Court is required to rule on admissa-

bility at the summary judgment stage. At trial, however, the plaintiff must present sufficient admissable evidence to support the essential elements of each claim in order to have that claim decided by the jury. Should plaintiff's proofs fail, for whatever reason, the Court may certainly direct a verdict as to those claims unsupported by sufficient evidence.

**4.** Those aspects of this Court's preliminary injunction order which were reversed by the Court of Appeals were reversed as errors of law, not fact.

case and, presumably, may be offered at trial.[5] Thus, the inescapable conclusion is that there are material issues of fact in dispute with respect to plaintiff's trade secret claims, including those already identified by this Court and affirmed by the Court of Appeals.[6]

Defendants' denials that they were aware of SI's claim of trade secrets, as well as their denials that they used those items which SI claimed as trade secrets, create additional issues of fact for the jury's consideration. By the same token, those portions of the deposition testimony of some of plaintiff's witnesses which contradicts or appears to contradict testimony given at the preliminary injunction hearing may make for effective arguments to the jury, but the purported contradictions do not entitle the defendants to summary judgment.

Finally, we see no need to enter judgment with respect to the "trade secrets" which this Court identified but which the Court of Appeals held not to be trade secrets as a matter of law. Obviously, plaintiff will not be permitted to prove or attempt to prove that those items are trade secrets.[7]

## B. Discovery/Ownership Requirement

■ Defendants argue that plaintiff lacks standing to assert trade secret protection for itself in that it neither discovered nor otherwise owns the trade secrets embodied in CARTRAC. As to defendants' first basis for this argument, that the individual defendants actually created CARTRAC and that SI would not possess it but for their efforts, there is no support for such a conclusion. In the first instance, assuming the argument has some validity as to those defendants who contributed to the development of CARTRAC, it is certainly not a basis for summary judgment for the corporate defendants or for those defendants who had no part in engineering CARTRAC. Even as to those defendants who were engineers, it is surely a novel concept to assume or conclude that an employer is not the owner of the fruits of its employees' labor. Not surprisingly, defendants have cited no controlling case law to support such a conclusion.[8]

Finally, the defendants who developed CARTRAC at SI were subject to employment agreements in which they agreed to "give SI the full benefit, enjoyment, *ownership* and title to all improvements and

---

**5.** By this statement we do not mean to imply a ruling on the admissability of any evidence which may be subject to objection by the defendants. Likewise, we do not mean to imply that we are aware of any possible objections and/or the nature thereof. We have, however, become wearily accustomed to having unusual inferences drawn from our statements in this case. Understandably, we are becoming cautious, perhaps excessively so, and wish to forestall unwarranted conclusions by both parties whenever possible.

**6.** We reiterate that we are not certain that the jury will need to be as specific in identifying the trade secrets as the Court was in the preliminary injunction order. On the contrary, like specificity may be required by way of interrogatories to the jury. This issue may require further clarification as trial approaches and progresses. Much depends upon the attitudes of counsel. Cooperation is hoped for but continued antagonism will represent no surprise.

**7.** It is noteworthy that of the seven items identified by this Court as trade secrets but reversed by the Circuit Court, five are in no way embodied in the CARTRAC product itself. Instead, those five relate to knowledge and experience

acquired by the defendants while employed at SI, all of which could be subsumed under the term "know-how". Moreover, while two of the items, a two-way accumulation system allegedly developed for ROBOTRAC while the defendants were still employed by SI and methods for achieving car-to-car accumulation without infringing on the Jacoby patent, are not entitled to trade secret protection, they may be used to establish other claims. *See, SI Handling Systems, Inc. v. Heisley*, 753 F.2d at 1259, 1260.

**8.** Although we have not found a case from Pennsylvania that speaks directly to this issue, it appears that if required to address it, the state courts would conclude, at a minimum, that an employer owns the trade secrets developed by its employee where the employer has specifically commissioned the project which resulted in the development of the trade secrets. In *Wexler v. Greenberg*, 399 Pa. 569, 160 A.2d 430 (1960), the Pennsylvania Supreme Court cited and discussed with approval *Wireless Specialty Apparatus Co. v. Mica Condenser Co., Ltd.*, 239 Mass. 158, 131 N.E. 307 (1921) in which the Massachusetts Supreme Court found, in circumstances analogous to those in this case, that ownership of trade secrets developed by employees was vested in the employer.

inventions ... of apparatus, appliances, devices and methods ... developed during ... employment". (Exhibit A to the Complaint, Doc. # 1). (Emphasis added).[9] Although the true effect of this provision in this context is merely to make explicit the usual obligations of an employee while on the job, it serves to emphasize the insubstantiality of this portion of defendants' ownership argument.

More serious is defendants' contention that the plaintiff concealed from the Court the indisputable fact that it never owned the technology upon which its CARTRAC product is based. The origin of this argument is the defendants' purportedly recent discovery that there is no agreement between SI and IHI, the Japanese source of the "Tokunaga Formula Book". Instead, there is an agreement between IHI and SII, a wholly-owned subsidiary of SI relating to technology transfer and the formation of a joint venture company, SIHI. Defendants conclude, in a footnote to their brief, (Doc. # 234 at 29, n. 9), that such an agreement, "of course", is not effective in conferring ownership of the technology on SI.

■■■ Defendants, however, conveniently neglect to explore the relationship between SI and SII and have offered no support for their conclusion that the parent cannot and does not own that which has been acquired by its wholly-owned subsidiary. The only authority which this Court has been able to discover suggests otherwise. In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628, 643 (1984), the Supreme Court described the relationship between a parent and its wholly-owned subsidiary as follows:

A parent and its wholly-owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. *With or without a formal "agreement", the subsidiary acts for the benefit of the parent, its sole shareholder.* (Emphasis added).

Although in *Copperweld* the Court was discussing a different issue, the validity of a parent-subsidiary combination as a basis for liability under the antitrust laws, we consider the description quoted above to be equally applicable to the situation which we here confront, notwithstanding the defendants' unsupported conclusion to the contrary. Thus, we do not find it damaging to plaintiff's claim of ownership of the alleged trade secrets, nor even particularly surprising, that there are no agreements between SII and its parent, SI, relating to a transfer of technology to SI since they are essentially one and the same entity.

C. Disclosure to Unrelated Third Parties.

Defendants next argue that plaintiff has never made an agreement to keep the technology it received from IHI secret and that it has, in fact, disclosed those items and others for which it claims trade secret protection to an Australian company without restriction.

■■■ Once again, defendants have failed to support a legal contention with any authority whatsoever, much less with any reference to a controlling rule of law. Obviously, if the defendants can show that SI has failed to keep confidential information that it now claims as its trade secret, such information is not entitled to protection. *Van Products v. General Welding*, 419 Pa. 248, 213 A.2d 769 (1965). Assuming, however, that SI, through its wholly-owned subsidiary, SII, owns the technology obtained from IHI, it is free to do with the information so obtained whatever it wishes. It is SI, not IHI, that is claiming protection for its trade secrets. The Court is at a loss to understand why it should be necessary for SI to have executed a confidentiality agreement through which it obligates itself

---

**9.** Issues relating to the validity and enforceability of the Employment Agreement will be discussed at length, *infra*.

to nondisclosure of its own claimed trade secrets. Lack of such an agreement is certainly not controlling on the disclosure issue.

Defendants also contend that SI disclosed its claimed trade secrets to Acrow, Ltd., an Australian company, without confidentiality restrictions. The evidentiary support for this contention are affidavits in which some of the individual defendants expressed their *belief* that SI made such disclosures. (Exhibit Q to Doc. # 234). In addition, there is a supplemental affidavit of Michael Hiesley in which he relates hearsay, supplemented by his conclusions, as to drawings he obtained from Acrow and his interpretation of a telex from Jack Bradt of SI to an Acrow officer. (Exhibit X to Defendants' Reply Memorandum, Doc. # 247).

■ Even without the production of conflicting evidence by the plaintiff, it is doubtful that defendants would be entitled to summary judgment. We need not rule upon the sufficiency of the defendants' support for their disclosure argument, however, because the plaintiff has supplied documents and a supplemental affidavit of its own, unquestionably rendering the issue of whether SI made unrestricted disclosures to Acrow one for the jury. (*See*, Exhibit B to Plaintiff's Response to Defendants' Reply Memorandum, Doc. # 250).

### D. Damages.

Defendants' final attempt to obtain at least a partial summary judgment with respect to the trade secret issues is a request that the Court restrict the time for which plaintiff is entitled to receive damages should the jury determine the trade secret issues in its favor. Defendants contend that their affidavits establish that they observed the terms of the preliminary injunction so, therefore, plaintiff is not entitled to damages for that period of time.

It is, of course, plaintiff's burden to establish its damages. The proper measure

thereof in an action for misappropriation of trade secrets is "the benefits, profits or advantage gained by Defendant in the use of the trade secret". *Reinforced Molding Corp. v. General Electric Co.*, 592 F.Supp. 1083, 1088 (W.D.Pa.1984). Thus, plaintiff is required to prove that defendants used its trade secrets and obtained a quantifiable advantage thereby during the period in question. Should plaintiff fail to do so for the time in question, or for any other period of time, then, of course, it cannot recover damages for that span.

■ Thus, the issue is not whether the defendants observed the Court's order, nor whether damages are recoverable for the time covered by the preliminary injunction. Rather, the issue is what the plaintiff can establish as damages. Concededly, the affidavits can be read as stating that since defendants used no trade secrets while the injunction was in force, plaintiff necessarily can prove no damages during that period. Obviously, plaintiff is not bound by defendants' affidavits where there is sufficient conflict in the record to preclude summary judgment on an issue. Although the Court, in deciding two motions for contempt during the time the injunction was in force, failed to find violations of its order, that is not binding on a jury. Similarly, our decision to limit injunctive relief to somewhat more than a year because we found that defendants could have produced ROBOTRAC without the use of SI's trade secrets in that amount of time is not determinative on the question of damages. A jury may well select another period of time, longer or shorter, depending upon which evidence it believes, as the span for which damages are recoverable.[10]

### III. Contract Claims.

#### A. Breach of Contract

It is undisputed that all of the individual defendants who were employed by SI Handling signed identical employment agree-

---

**10.** Conversely, of course, the jury may find, for one or more of several reasons, that plaintiff is not entitled to recover anything with respect to its trade secret claims. On the other hand, the jury might conclude that, even with the knowl-

edge and experience gained in engineering CARTRAC, the defendants would have been unable to develop a comparable system independently, *e.g.*, without access to the Tokunaga Formula Book.

ments. In addition to its trade secret claims against these former employees, SI has also stated a cause of action against them for breach of their employment agreements.

Defendants contend that they are entitled to summary judgment on this claim because the agreement is unenforceable under Pennsylvania law. In reality, however, defendants have addressed only one small portion of the entire agreement, that which might be termed a "restrictive covenant". The challenged paragraph reads as follows:

2. All information received by me relating to the business of SI shall be deemed strictly its exclusive property, and shall remain SI's valuable scientific trade and engineering secrets, both during and after my employment, without limitation as to time, and I shall not at any time reveal any such information to others, except in cases when this is necessary for the performance of my duties for SI, and then only with the consent of SI; nor shall I make use of any such information in any way hostile to that of SI.

Defendants assert two bases for their arguments on this issue: that the covenant is not reasonably restricted as to time, place and nature of the information to be kept confidential and that the agreement was not signed by two of the defendants at the time they were hired by SI.

As to the first issue, the plaintiff argues that defendants' contentions misconstrue Pennsylvania law in that the cases upon which they rely to support their position deal with covenants not to compete, as opposed to employment agreements. We find this argument unpersuasive.

■ In the first instance, while it may be true that there is no case which directly addresses the applicability of noncompetition clause standards to an agreement without such an express provision, our sense of Pennsylvania law in this area convinces us that any agreement which seeks to restrict post-employment activities is subject to the same standards. *See, e.g., Wexler v. Greenberg,* 399 Pa. 569, 160 A.2d

430 (1960), in which there was no express agreement whatsoever. In *Wexler,* the court concluded that, in some circumstances, an agreement not to disclose the former employer's trade secrets may be *implied* from the confidential nature of the employment relationship. The court went on to comment that since express covenants not to compete are closely scrutinized for reasonableness, such an inquiry is similarly appropriate where there is an implied duty not to disclose confidential information. Likewise, in *Beneficial Finance Co. v. Becker,* 422 Pa. 531, 222 A.2d 873 (1966) and *John G. Bryant Co. v. Sling Testing and Repair, Inc.,* 471 Pa. 1, 369 A.2d 1164 (1977), the Pennsylvania Supreme Court spoke in terms of "restrictive covenants" and "post-employment restraints", not non-competition clauses *per se.* Thus, we do not believe that Pennsylvania law supports the narrow distinction for which plaintiff contends.

■ Second, a broad reading of the clause in question leads to the conclusion that a non-competition restraint may fairly be implied by the phrase, "nor shall I make use of any such information in any way hostile to that of SI". Moreover, the term "information" includes "All information received by me relating to the business of SI ...". If read literally, the clause in question would restrict defendants' use in other employment of general knowledge and skill obtained through their employment at SI. That, of course, is not permissible. *Wexler v. Greenberg, supra.*

Plaintiff also contends that if the Court should find the clause too broad, it may be restricted by the Court and the reasonable terms thereof enforced. That is a permissible course under Pennsylvania law. *Jacobson & Co., Inc. v. International Environment Corp.,* 427 Pa. 439, 235 A.2d 612 (1967).

■ In addition, as noted, Pennsylvania law permits a reasonable agreement not to disclose trade secrets to be implied from the confidential nature of the relationship. The evidence supports the conclusion that such a relationship exists here. The situa-

tion between plaintiff and defendants falls squarely within the parameters delineated by the Pennsylvania Supreme Court in *Wexler v. Greenberg, supra.* Thus, we find ample authority for allowing the plaintiff to present its case for breach of the employment agreement admittedly signed by certain individual defendants.

█ Although defendants Dentner and Ziegenfus have presented affidavits in which they recite that they did not sign their agreements simultaneously with their first becoming employed at SI, this fact is not dispositive of the enforceability of their agreements. While one of the conditions for enforcement of post-employment restrictions in Pennsylvania is that the agreement be ancillary to employment, that term is not as narrowly construed as defendants contend. Such an agreement is valid and enforceable even when signed a considerable time after the employment relationship begins if there is a subsequent change in employment status which supplies sufficient consideration for the agreement. *Jacobson & Co., Inc. v. International Environment Corp., supra.* There is nothing in the record from which the Court can conclusively determine that such consideration did not exist.

Finally, we note two additional problems with defendants' sweeping statement that they are entitled to summary judgment on plaintiff's breach of contract claims for the reasons stated in their brief. First, as noted, their arguments are directed only to ¶ 2 of the employment agreement. No contentions have been made with respect to the remainder of the agreement which deals with the defendants' obligations while employed at SI. The Pennsylvania cases cited above are concerned with conditions precedent to the enforcement of post-employment restrictions. We are by no means convinced that these standards, rather than general principles of contract law, apply to other terms of an employment agreement. Second, even as to the post-employment restrictions, the Pennsylvania cases are concerned only with equitable enforcement. We understand plaintiff to be asserting legal as well as equitable claims with re-

spect to this cause of action. The principles to be applied to determining the legal enforceability of post-employment restraints and the proper measure of damages are also issues which have not been addressed by any of the parties to this dispute.

█ Thus, certain questions of law are far from clear and must await trial and the production of evidence as to plaintiff's contract claims. It is possible that these issues may require further briefing and, perhaps, a pre-trial determination and order. Clearly, they are not the subject of a motion for summary judgment in light of evidence already in the record from which a jury might conclude that defendants breached one or more of the provisions of their employment agreements, no matter what principles apply. We here seek to put counsel on notice of things to come.

B. Interference with Contract.

As both plaintiff and defendants recognize, Pennsylvania, under certain circumstances, allows a claim for interference with an employment contract. Specifically, in *Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 633, 634, 136 A.2d 838 (1957), the Pennsylvania Supreme Court identified two situations in which liability might be found:

> The systematic inducing of employes to leave their present employment and take work with another is unlawful when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employes. So also, when the inducement is made for the purpose of having the employes commit wrongs, such as disclosing their former employer's trade secret or enticing away his customers, the injured employer is entitled to protection.

In *Franklin Music v. American Broadcasting Companies,* 616 F.2d 528 (3d Cir. 1979), a case that is in many respects factually similar to this one, the Court of Appeals discussed subsequent refinements of Pennsylvania law and the factors to be

considered in determining whether it is unlawful for a competitor to attempt to hire away at-will employees or otherwise interfere with another's contracts or prospective contracts. The court concluded that Pennsylvania has adopted the Restatement (Second) of Torts §§ 766—768 [11] as a framework for analyzing the activities of those who compete for the services of one already employed by another and/or another's customers. In brief, the important factors to be considered with respect to § 767 are the actor's conduct and motives, the competing interests of the parties and society, the proximity of the conduct to the interference and the relations between the parties. If the interference concerns a matter of competition, § 768 considers it not improper if, (1) "the actor does not employ wrongful means" to accomplish his purpose, (2) the action does not constitute an unlawful restraint of trade, and (3) if his motive is at least partially, "to advance his interest in competing with the other".

The plaintiff in this case has asserted claims with respect to both facets of interference identified by the Pennsylvania Supreme Court as well as other aspects of interference as discussed in detail by the Third Circuit in *Franklin Music*. In ¶¶ 55–59 of the complaint, plaintiff has stated a cause of action against the corporate defendants (HEICO, Eagle and SyCon) for allegedly inducing SI's former employees to breach their post-employment convenant not to disclose confidential information. In ¶¶ 70–83, plaintiff has alleged that Heisley, Bitely, Dentner and Hughes, in addition to the corporate defendants, interfered with SI's business relationships and contracts with its employees and customers.[12]

Once again, defendants rely solely upon the affidavits found in Exhibit Q to the Memorandum in support of their Motion for Summary Judgment as evidence of the absence of material issues of fact in dispute. Once again, looking to the record as it presently stands, including evidence adduced at the preliminary injunction hearing, and taking into account the law which we are required to apply, this Court cannot agree that summary judgment is appropriate.

■ Despite defendants' denials by affidavit of any impropriety, there is ample evidence from which a jury might properly infer that the entire purpose of instituting the ROBOTRAC venture was to drive SI from the spinning tube, car-on-track materials handling market. There is evidence that individual employees were approached about leaving SI before a competing venture existed. There is also evidence that the services of former SI employees, and of some SI employees who never left the plaintiff, were offered to existing competitors.

As to other claims involving former employees, if plaintiff can establish that trade secrets were misappropriated, the circumstances relating thereto could support a finding that the corporate defendants procured the trade secrets by inducing individual defendants to breach their employment contracts.

Plaintiff's claims of interference with contractual or prospective contractual relationships with its customers are somewhat

**11.** § 766 of the Restatement (Second) of Torts is simply the general statement of the tort:
§ 766. Intentional Interference with Performance of Contract by Third Person
One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.
§ 766B deals with intentional interference with a prospective contractual relationship.

§ 767 sets forth general standards for determining whether an interference is improper.
§ 768 is the section which deals with interference in the context of business competition.

**12.** According to the Third Circuit in *Franklin Music,* Pennsylvania applies § 767 of the Restatement to interference with an employment contract even where the employee later becomes a business competitor. Consequently, § 767 applies to Count IV of the Complaint (¶¶ 55–59) and the portions of Count VIII (¶¶ 70–83) which refer to SI's employees, while § 768 applies to the remainder of Count VIII.

more tenuous than its claims with respect to its former employees. In the context of this case, however, where most of the evidence is likely to be presented in support of SI's trade secret claims and where there is evidence that defendants solicited plaintiff's customers, it is premature to conclude, as a matter of law, that there has been no improper interference with contractual or prospective contractual relationships. One of several conditions which can render competitive activities tortious under §§ 766 and 768 of the Restatement is employing wrongful means to obtain a contract. If a jury finds that defendants misappropriated trade secrets and, for that reason, were able to induce plaintiff's customers to deal with them rather than plaintiff, those findings could support a judgment for improper interference.

## IV. Conspiracy

 Premised upon their contentions that they are entitled to judgment on plaintiff's contract and trade secret claims, as well as upon the denials of all wrongdoing contained in the ubiquitous affidavits, defendants have understandably moved for summary judgment on the conspiracy count of the complaint. Just as we have found it necessary to reject defendants' arguments with respect to other claims heretofore considered, we must do the same in this instance. Defendants' denials of concerted action are contradicted, at least circumstantially, by considerable contrary evidence. There are letters and verbal testimony which could support a conclusion that defendants were systematically planning to build a competing organization on the foundation of SI employees, some of whom were to remain employed by SI until all the details for the commencement of ROBOTRAC were finalized. Obviously, if a jury were to conclude that plaintiff had failed to prove its case with respect to other claims, the activities which may support the conspiracy claim might necessarily

be considered innocent. We have not yet reached that point. SI is entitled to present its conspiracy claim to the jury along with the other claims considered thus far.

## V. RICO.

In ¶¶ 64–70 of the complaint, plaintiff alleged a cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* As to anyone who has received income derived from a pattern of racketeering activity, the RICO statute prohibits the use or investment of such income in any enterprise affecting commerce (18 U.S.C. § 1962(a)); prohibits control of such an enterprise through a pattern of racketeering activity (§ 1962(b)); prohibits employees of an enterprise which affects interstate commerce from participating in the affairs of the enterprise through a pattern of racketeering activity (§ 1962(c)); prohibits conspiracy to violate any of the foregoing provisions (§ 1962(d)).

Plaintiff avers that defendants' activities in misappropriating trade secrets were accompanied by mail and telephone communications and that the defendants engaged in interstate transportation of stolen articles, providing the necessary predicate acts to establish a pattern of racketeering activity. Plaintiff also alleges that various individual defendants derived income from the pattern of racketeering activity and used it in the operation of Heico, the alleged enterprise, and/or contracted or participated in the affairs of the enterprise, Heico, through a pattern of racketeering activity.[13]

Defendants' arguments in support of summary judgment on this count are fourfold: (1) that the incontrovertible evidence produced by the defendants establishes that there was no knowing scheme to defraud so that there can be no intent to use the mails or wire communications in furtherance thereof; (2) that there is no evi-

---

**13.** As noted in plaintiff's brief, ¶ 69 of the complaint alleges participation in "a pattern of racketeering activity" rather than an "enterprise". Plaintiff requests that said paragraph be amended to delete "a pattern of racketeering activity" and substitute the term "enterprise". We have treated the complaint as if it were so amended and have formally granted the amendment in the order accompanying this Memorandum.

dence that defendants took anything from SI and, therefore, there can be no violation of the National Stolen Property Act; (3) that there are no allegations of an enterprise separate from the defendants who allegedly participated in the alleged pattern of racketeering activity; (4) that the alleged pattern of racketeering activity was in furtherance of a single scheme, misappropriation of trade secrets, while RICO contemplates that there be multiple schemes rather than merely multiple indictable acts to satisfy the pattern requirement.

▮ Defendants' first contention is similar to the arguments made in support of summary judgment on the trade secret and conspiracy claims previously considered. In short, the viability of the argument depends upon defendants' success in gaining summary judgment on the trade secret claims. As noted previously, the Court does not consider the evidence produced by the defendants "incontrovertible" and, in fact, has already held that there is sufficient conflict in the record to send plaintiff's trade secret allegations to the jury. Likewise, much of the evidence which might support plaintiff's conspiracy claim may also be cited to establish that defendants committed the predicate acts necessary to make out a civil RICO violation. Thus, the reasons previously given for not granting summary judgment on these claims apply here as well.

As also noted previously, evidence as to whether or not any of the defendants took drawings, formulae or other items with them when they left SI is too equivocal to support summary judgment. Moreover, even if plaintiff cannot establish theft of any tangible property, it may still be able to prove indictable acts of mail or wire fraud or both.

The only possible basis for defendants' contention that plaintiff failed to allege an enterprise distinct from those who engaged in a pattern of racketeering activity is the allegation found in ¶ 66 of the complaint where Heico, otherwise named as the enterprise, is averred to have engaged in mail and wire fraud along with the individual defendants.

To the extent that the mail and wire fraud allegations made against Heico destroy the separate enterprise requirement of the RICO statute, if they do,[14] defendants may be entitled to a judgment that ¶ 66 of the complaint does not properly allege a RICO claim. It is by no means clear, however, whether this is the basis for defendants' argument on this point. Moreover, were we to request further briefing on this point and defendants were to clarify their contention consistently with what we have surmised, plaintiff would simply request that the complaint be amended to delete Heico from ¶ 66. Thus, to avoid such an exercise in futility, we decline to enter summary judgment on that basis.

Finally, we consider the legal argument that RICO requires multiple schemes to establish a pattern of racketeering activity. While it is true that some courts have so held, others have not. *Compare, e.g., Superior Oil Co. v. Fulmer*, 785 F.2d 252 (8th Cir.1986) with *Bank of America v. Touche Ross & Co.*, 782 F.2d 966 (11th Cir.1986). Both of the courts which decided the above cited cases purport to have followed the United States Supreme Court's suggestion in *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), that a more meaningful concept of "pattern of racketeering activity" be developed. Both courts agree that a pattern requires both the commission of more than one predicate act and the threat of continuing activity. In *Superior Oil*, the Eighth Circuit Court of Appeals concluded that the continuity requirement could be satisfied

**14.** In *Seville Industries v. Southmost Machinery Corp.*, 742 F.2d 786 (3d Cir.1984), the Court of Appeals referred to the issue of whether the same entity may be an enterprise as well as a defendant, for purposes of stating a claim under RICO but did not decide the question. Because the basis for defendants' argument on this point is unclear, we, too, decline to undertake the analysis necessary to decide the question since our views could be construed as gratuitous or merely advisory. Moreover, as noted, the entire problem can be eliminated simply by deleting Heico as a defendant in only one paragraph of the complaint.

only by pervasive criminal activity, *i.e.,* a showing of more than one unlawful scheme not a number of predicate acts committed in furtherance of a single illegal scheme. The Eleventh Circuit Court of Appeals, however, concluded that several acts in furtherance of a single scheme are sufficient to satisfy the continuing activity requirement.

Our concern, of course, is which line of reasoning is likely to be adopted by the Third Circuit Court of Appeals and, ultimately, by the United States Supreme Court.

■ Although the Court of Appeals for the Third Circuit declined to address the issue of defining "pattern" in the wake of *Sedima,* we discern from its brief allusion to the question in *Malley-Duff Associates v. Crown Life Insurance Co.,* 792 F.2d 341, 353, n. 20 (3d Cir.1986) that it would not follow the Eighth Circuit's lead in imposing a requirement of multiple schemes as well as multiple predicate acts. In *Malley-Duff* the court suggested that the same scheme carried out in several locations is enough to satisfy the pattern requirement of RICO.

■ We conclude that the activities of which plaintiff complains here are sufficiently similar to the circumstances which existed in *Malley-Duff* that the pattern requirement of RICO is satisfied. While there has been only one scheme alleged, there are sufficient allegations of concerted activity directed specifically toward a goal of injuring, if not eliminating, SI to state a claim under RICO.

Moreover, we do not believe that the Eighth Circuit's position would be upheld if considered by the United States Supreme Court. The imposition of a requirement of multiple illegal schemes seems analogous to the attempt by the Second Circuit Court of Appeals to impose a requirement of conviction on predicate offenses in order to state a viable RICO claim. That approach to bringing RICO closer to what the court perceived as the original intent of the law, *i.e.,* the creation of a means to attack organized crime, was rejected by the Supreme Court in *Sedima.* Likewise, in our view, the court would reject the Eighth Circuit's

construction of the term "pattern of racketeering activity" as an impermissible judicial attempt to rewrite the RICO statute.

In making these comments and observations, we are not unaware that for many years the RICO statute has not been fully used in the criminal field. However, more recently, it has been more frequently used and there are those who predict its greater usage in the near future in the pursuit of organized crime. All that, however, gives us no help in dealing with the vague issues here involved. In the course of what appears will be a protracted trial, we shall deal with the issues as they arise on the basis of the evidence produced.

## VI. Antitrust.

Given the length and complexity of the proceedings already had in this case and the prospect of more of the same before it can be resolved, it is tempting to follow the defendants' suggestion to simplify and eliminate claims. That can only be accomplished, however, when the relevant legal standards permit. As our analysis of the issues has demonstrated, the law does not support the defendants' position on any of the issues heretofore considered.

As we turn to a consideration of defendants' arguments as to plaintiff's antitrust claims, the temptation, to simplify and eliminate, returns with renewed force. At first blush, it appears so logical to seize upon the facile, common-sense result that the antitrust claims should not be tried. It seems obvious that in a situation in which competition did not exist before defendants entered the spinning tube, car-on-track materials handling market, there can be no antitrust claim against the new competitors. As we are all surely aware by now, however, common-sense, federal statutes and the judicial construction thereof do not always completely coincide.

In ¶ 73 of the complaint, plaintiff states a claim under 15 U.S.C. § 1, which prohibits any contract, combination or conspiracy in restraint of trade. Defendants argue strenuously that a § 1 violation can exist only when the plaintiff can demonstrate an

anticompetitive effect from the defendants' activities and that evidence produced by the defendants here negates that necessary showing.

While the law on this point is not crystal clear, there is language in cases from both the United States Supreme Court and the Third Circuit Court of Appeals indicating that evidence of an anticompetitive effect is not essential to proving a § 1 violation:

> [I]n a civil action under the Sherman Act, liability may be established by proof of *either* an unlawful purpose or an anti-competitive effect.

*McLain v. Real Estate Board of New Orleans,* 444 U.S. 232, 243, 100 S.Ct. 502, 509, 62 L.Ed.2d 441, 451 (1980). (Emphasis in original). Likewise, in *Tose v. First Pennsylvania Bank, M.A.,* 648 F.2d 879, 893, n. 17, (3d Cir.1981), Chief Judge Aldisert noted that:

> Our cases make it clear that proof of anticompetitive *impact or intent* is a necessary element of a prima facie case under the rule of reason. (Emphasis ours). *See, e.g., Franklin Music Co. v. American Broadcasting Co., Inc.* 616 F.2d 528, 541–42 (3d Cir.1979) (Gibbons, J., announcing decision of the court) *id.,* at 553–56 (Sloviter, J. concurring in part) (Remaining citations omitted).

■ In short, we cannot conclude, as a matter of law, that plaintiff cannot show a § 1 antitrust violation here. There is no inescapable inference that a new group entering a field is incapable of violating the Sherman Act. This is particularly true if, as plaintiff argues, it does so with the *intent* of substituting itself as the sole supplier of the product, directs its activities to achieving that end and has experienced considerable success in doing so.

*Intent* is certainly a jury question when one side maintains that it was simply trying to reap the benefits of the free enterprise system while the other side imputes to its opponents more sinister motives. In this case, *effect* is also a jury question. We cannot conclude on the basis of the statistics supplied by the defendants that there has been no anticompetitive effect from their activities. Neither can we conclude that there has been no anticompetitive intent. Moreover, we have no way of determining whether plaintiff intends to prove intent, or effect, or both in attempting to support its § 1 claim.[15]

■ Because we agree with defendants' general position that resolution of issues pre-trial should be attempted wherever possible, and although we decline to grant summary judgment to defendants on the § 1 claim, we are constrained to add a *caveat.* Plaintiff seems to argue, with respect to the intent necessary to prove a § 1 violation, that its burden is simply to show that defendants intended to cripple or destroy SI. The intent necessary for a § 1 violation, however, must be an *anti-competitive* intent and may not simply be inferred from what plaintiff characterizes as unlawful or "immoral" acts designed to injure SI. The difference was cogently explained in *Franklin Music v. American Broadcasting Companies,* 616 F.2d 528, 556 (3d Cir.1979) (Sloviter, J. concurring).

> There is a substantial difference between intent to injure a party which supports a tort recovery and the type of anticompetitive intent on which a Sherman Act § 1 claim can be founded. For example, if two disgruntled customers conspire to burn a department store which would, if accomplished, have the effect of destroying its business, it seems improbable that a court would hold that the intent which suffices to support a claim under state tort law is itself also enough to support a claim for violation of Section 1 of the Sherman Act. The anticompetitive intent which acts as a "surrogate for effects" must be targeted directly to the victim in its competitive aspects—injury to the vic-

---

**15.** Our uncertainty results from plaintiff's production of evidence disputing defendants' statistics which suggest that SI retains a considerable share of the car-on-track materials handling market. Plaintiff refers to this evidence only as supporting its § 2 claim, but we see no reason that it might not be used in support of the § 1 claim as well. Plaintiff has, in general, argued in general terms in support of its antitrust claims without distinguishing the elements of proof necessary for a § 1 claim and those essential for a § 2 claim.

tim *qua* competitor. It follows that plaintiff in this case cannot resurrect its antitrust claim because of its success before the jury on the intentional state tort claims, even though the necessary predicate of that success was the finding of an intent to injure plaintiff.

Plaintiff has also alleged that defendants are attempting to monopolize the relevant market in violation of 15 U.S.C. § 2. Both sides agree that the elements of a § 2 claim are specific intent to gain a monopoly or exclude competitors in a relevant market and a dangerous probability of success. *CVD, Inc. v. Raytheon,* 769 F.2d 842 (1st Cir.1985). Defendants' arguments in support of summary judgment on the § 2 claim are directed toward showing that their activities have had minimum impact on SI's position in the worldwide spinning tube car-on-track materials handling market. Plaintiff, on the other hand, contends that its claim is more properly directed toward the *automotive sub-market.* Although there is some evidence in the record that SI is involved in what might be considered the worldwide market, there is also an abundance of testimony that it is and has been particularly and primarily concerned with its loss of contracts in the automotive sub-market. Indeed, the testimony at the preliminary injunction hearing dealt exclusively with the latter.

In light of the lack of certainty in the record as to the relevant market for plaintiff's § 2 claim, this, too, is a question for the jury. *Weiss v. York Hospital,* 745 F.2d 786 (3d Cir.1984).

VII. Claims against Sy-Con and Thomas Hughes.

Defendants contend that SI has adduced no evidence to indicate that Sy-Con and Thomas Hughes participated in any way in the various activities alleged to be unlawful by the plaintiff. Plaintiff has responded only minimally to this contention and has pointed to nothing in the record suggesting that it will be able to support its allegations as to those defendants. Consequently, judgment will be entered in their favor on all claims.

In all other respects, defendants' motion for summary judgment will be denied for the reasons stated.

## CONCLUSION

In deciding the multiple issues here involved, we have taken the liberty of rambling into adjacent areas. In so doing we have exposed areas of potential and future problems and uncertainties, all of which we are prepared to resolve as this complex and complicated trial progresses and unfolds. We hope that counsel and their clients, noting our allusions to future problems and continued litigation, will see the wisdom of some cooperation and, laying aside their hatreds and antagonisms, or some of them, allow their judgments to control the future of this otherwise complex case.

## ORDER

AND NOW, this 7th day of November, 1986, upon consideration of plaintiff's motion to amend ¶ 69 of the complaint to delete the words "pattern of racketeering activity" and to substitute therefor the word "enterprise", IT IS ORDERED that the motion is GRANT ED and the complaint so amended.

IT IS FURTHER ORDERED that upon consideration of defendants', Thomas Hughes' and Sy-Con Technology, Inc.'s, motion for summary judgment on all claims, the motion is GRANTED and judgment is entered in favor of those defendants only.

IT IS FURTHER ORDERED that upon consideration of the remaining defendants' motion for summary judgment, plaintiff's response thereto, all briefs of counsel, oral argument, and the entire record, the motion is DENIED.